32 A.3d 59

**Gary James SMITH**

v.

**STATE of Maryland.**

**No. 10, Sept. Term, 2011.**

Court of Appeals of Maryland.

Nov. 29, 2011.

574

Gary E. Bair (Bennett & Bair, LLC, Greenbelt, MD), on brief, for petitioner.

James E. Williams, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, JOHN C. ELDRIDGE (retired, specially assigned), and LAWRENCE F. RODOWSKY (retired, specially assigned), JJ.

LAWRENCE F. RODOWSKY (retired, specially assigned), J.

Petitioner, Gary James Smith (Smith), was convicted at a jury trial in the Circuit Court for Montgomery County of depraved heart second-degree murder and use of a handgun in the commission of a felony. The court sentenced him to thirty years confinement for murder and to a second consecutive twenty year sentence on the handgun charge, with all but five years suspended and five years probation to be served upon release. The principal issue at trial was whether the deceased, Michael McQueen, Jr. (McQueen), was murdered or committed suicide. Smith appealed, contending, *inter alia,* that the trial court had erroneously excluded certain defense evidence relating to McQueen's state of mind. The Court of Special Appeals affirmed, 196 Md.App. 494, 10 A.3d 798 (2010), concluding that the excluded evidence was too remote and not reliable. This Court granted Smith's petition for certiorari. *Smith v. State,* 418 Md. 587, 16 A.3d 977 (2011). The lead question presented by the petitioner is:

"1. In this case where homicide versus suicide was the cornerstone issue, did the Court of Special Appeals err in affirming the trial court's decision to admit prosecution evidence of the decedent's 'normal' state of mind but refused to admit equally relevant defense evidence of the decedent's 'depressed' state of mind?"

As explained below, we shall hold that the trial court abused its discretion in excluding the evidence proffered by the accused.[1]

---

1. We also granted certiorari on two additional questions raised by the petitioner. They are:

"1. Did the Court of Special Appeals err in finding an erroneous jury instruction on voluntary intoxication to be harmless after both parties and the court acknowledged that it likely had a significant influence on the outcome of the case?

"3. Did the Court of Special Appeals err in concluding that a key discovery violation made by the State was harmless error when such a violation was found to be reversible in this Court's case of *Hutchins v. State* [, 339 Md. 466, 663 A.2d 1281 (1995) ]?"

## Undisputed Background Facts

McQueen died in the early morning hours of Tuesday, September 26, 2006. The cause of death was a contact, non-through-and-through gunshot wound to the right temple. He died in the living room of an apartment in Gaithersburg that McQueen and Smith shared, beginning in early September 2006. McQueen was age twenty-two at the time, and Smith was age twenty-three. Both were former Army Rangers who, for two different periods, had served together in the same intelligence unit in Afghanistan. McQueen was a private, and Smith was his sergeant.

McQueen returned from his third Afghanistan deployment to Fort Benning, Georgia in late June 2006. While at Fort Benning, McQueen, in early August 2006, was arrested for DWI in Acworth City, Georgia. Evidence proffered by Smith concerning McQueen's arrest is the basis of the issue before us.

McQueen, on August 22, went on terminal leave and traveled north in a new car. His intention was to live in the Washington, D.C. area, rooming with a Ranger buddy, Ronny McKay. McQueen's plan was to attend the University of the District of Columbia and then transfer to Howard University, but he missed the registration for the Fall 2006 Term.

McQueen had told his mother that he had fallen in love with a young woman named Tina, who also served in the Army. On his way north from Fort Benning to Washington, McQueen visited in North Carolina for over a week with a close friend from the Rangers, Justin Jones. While there, McQueen told Jones about the Georgia DWI. When asked by the State, in its case-in-chief, whether McQueen was "overly distraught, or upset about" his arrest, Jones testified that McQueen was "pretty calm about it."

In North Carolina, Jones and McQueen also talked about the possibility of Tina's being pregnant. Jones testified:

---

Because of the conclusion that we reach on question one, it is unnecessary that we address the other two questions presented.

"Tina was a very attractive woman. As far as her being pregnant, like I said, he did feel some concern just because it wasn't a planned thing. And you know, but he didn't feel—he wasn't overly worried about it. It was just one of those things that could be possible, and it ended up being not true anyway. She wasn't pregnant, so." [2]

McQueen's plan to share living quarters with McKay did not work out, because McKay was living with his then girl-friend/future wife. When McQueen got to Washington, he stayed for a few days with Smith, his mother, and his grand-mother until the two former Rangers occupied their Gaithers-burg apartment under a lease signed September 2, 2006. Smith and McQueen had almost no living room furniture, and, on the fateful night, they were still keeping a considerable amount of clothing on the living room floor. Smith was attending school while McQueen had no fixed schedule. Smith did not testify, but he told the police that, in the evenings, he and McQueen went to the bars "a lot."

On the morning of Monday, September 25, McQueen and McKay spoke on the telephone about attending a job fair on Wednesday, the twenty-eighth. In that conversation McQueen "was basically saying that he can't live with [Smith] anymore." McQueen said, "He is not right in the head."

Smith also told the police that when he returned to the apartment from school late on the afternoon of Monday, the twenty-fifth, he and McQueen smoked some marijuana, had dinner, and drank a couple of beers. Thereafter, they went to the VFW Post in Gaithersburg where they consumed several inexpensively priced mixed drinks and played pool until ap-proximately 11:00 p.m. They then went to the Village Café where a patron treated each of them to a beer which neither finished. On autopsy, McQueen's blood alcohol content ranged from .20 percent per volume in the heart to .13 percent peripherally. There was no evidence from witnesses who

---

**2.** We find no direct evidence, and are not cited to any by the parties, that McQueen knew in his lifetime that Tina was not pregnant.

observed the two ex-Rangers that evening of any bad feelings between them.

A few minutes before 1:00 a.m. on Tuesday, September 26, the Montgomery County police responded to a 9-1-1 call that had been placed by Smith. Arriving at the apartment house in less than a minute, they found Smith outside, hysterical and with blood on his face, hands, and clothing. In the living room of the apartment was McQueen, dead from a gunshot wound to the right temple, but there was no gun.

McQueen was found seated in a metal framed chair with a mesh scoop or sling type seat. His head had fallen back over the top of the chair. On the left side of his lap was a marijuana grinder. His right arm hung down over the right arm of the chair. On the floor to the right of the chair (from the perspective of one seated in the chair) were a bottle of beer and a television game joystick. The chair faced a wall against which were a television set, that was playing, and a monitor for electronic games, that was not playing. Several feet to the front of the chair was a loop-type, gun-locking device.

There was a considerable amount of blood to the right of the chair. On the carpet at the rear of the chair was a greater concentration of blood. In the latter area, blood had drained from McQueen's wound when his head flopped to the rear.

In the bloodied area of the carpet was a section in which there was either no blood, or a considerably lesser amount of blood in relation to its surroundings. The parties at times called this section "the void." It is the field on which the battle of the experts was principally waged in this case. The outline of the void is roughly "V" shaped, with the angle of the V pointed toward the chair.

### Smith's Statements

Smith was arrested and was interrogated, in taped interviews. He gave three versions of what had transpired after the two ex-Rangers had left the Village Café and before he made the 9-1-1 call. In all three versions, Smith stated that

he dropped McQueen off at the apartment and continued on to his mother's house in order to pick up laundry because he had no clean socks to wear to school the next day.

In the first version, Smith stated that he was not in the apartment when the shot was fired. He said he came home to find McQueen slumped in the chair and, when he realized McQueen was not drunk, but that there was blood on the floor, he checked McQueen's neck and wrist for a pulse, but found none. He said there was no weapon in the apartment and suggested possible suspects, including some "Hispanic Mexican" guys in the community with whom he said McQueen had argued.

In the second version, Smith said that there was a gun in the apartment, a .38 caliber, five shot revolver, that belonged to Smith and that was kept hidden in a counter in the apartment. In this version, Smith reiterated that he returned to the apartment, found McQueen, and touched the body. He said that he panicked because the gun was his, his fingerprints would likely be on it, and because there was marijuana on McQueen's lap. He drove to nearby Lake Needwood, where he removed the four remaining bullets from the gun and separately threw it and the bullets into the water. Later, directed by Smith, the police recovered the weapon.

In the third version, Smith said that he brought his gun from his mother's when he picked up the laundry off of the porch at her house. He said:

"I put it in a case because I was going to go back over there and take the rest of my stuff with Mike's truck and I wanted the .38 there.

"So, I put it in a case inside of the little shaving kit pouch and put it inside the bottom drawer. When I was there I realized I couldn't fit the whole plastic case into my car so I was like I really don't want to leave the gun out here so I grabbed it and put it in the laundry basket underneath some of the laundry."

Smith further stated that, back at the apartment,

"I took [the gun] into the house. I just put it in my pocket and took it upstairs. I put it on the floor. I was like, you see this one, right, Mike? He goes 'yeah.' I said 'Okay. Watch out. It's loaded.' I went into the back bathroom. I was going number two. I came out and as I was walking out in the hallway I was about inside the room and I heard the bang."

Smith touched the body, panicked, and threw the gun and bullets into Lake Needwood.

## The Trial

This case was tried for twelve days, excluding jury selection. In its case-in-chief, the State presented twenty-two witnesses. The defense, in its case, presented twenty-five witnesses, including persons who had testified in the State's case. There were nine rebuttal witnesses called by the State, and the defense called one surrebuttal witness.

The central issue at trial was whether McQueen's death was a murder or a suicide. The jury was so advised by both parties in their opening statements. Expert evidence addressed to the issue was presented by both parties. Lay evidence addressed to the issue was presented by the State and admitted. Lay evidence addressed to the issue was proffered by the defense and not admitted.

### Expert Testimony—Blood Splatter

An assistant medical examiner, Dr. Carol H. Allan, determined that the manner of death was homicide. She was unable to reach that conclusion from the physical evidence, but based her conclusion on the police investigation. She found no blood splatter on the deceased's right hand, but acknowledged that that absence did not exclude suicide.

The blood splatter expert for the State was Dr. William Vosburgh, the Director of the Consolidated Forensic Laboratory for the District of Columbia. In his opinion, the portion of the void toward the chair was formed by the outline of Smith's right tennis shoe which had blood splatter on the right

side and top. Under this view, the void was formed when blood was ejected from McQueen's head immediately following the entry of the bullet, with the blood landing on the carpet around Smith's foot. This would place Smith at the time of the shot to the right of the chair, within contact range of McQueen's temple. Dr. Vosburgh also discerned on the carpet the outline of a left hand and opined that it was caused by blood that created a mist that fell over and around the hand and between the fingers of a person standing to the right of the chair.

This opinion was contradicted by the defense blood splatter expert, Professor Herbert MacDonnell, the founder of the International Association of Blood Stain Pattern Analysts. Professor MacDonnell was contacted by the State in August 2007 as a possible expert. After studying pictures of the blood splatter, Professor MacDonnell caused Smith's sneakers, pants, shirt and the section of carpeting containing the blood stains to be hand delivered to him in upstate New York for his further study. Four days later, Professor MacDonnell was discussing the case with the defense legal team.

In his opinion, the outline of the void was inconsistent with its having been formed by Smith's right sneaker. From the blood splatter on McQueen's shoulder and upper arm, the witness concluded that the deceased's right hand and arm were raised when the shot was fired. He also disagreed with Dr. Vosburgh's view that an apparent palm print in the carpet was caused by a mist of blood.

Barton Epstein, who had thirty-two years experience with the Minnesota State Crime Laboratory, was called by the defense and accepted as an expert in blood stain pattern analysis. In his opinion,

1. the void was not formed by the outline of Smith's right tennis shoe;
2. the blood on Smith's pants and right shoe dripped from the wound toward the carpet and was not blood propelled by pressure from the wound on impact of the bullet; and

3. the impression of a left hand on the carpet is a contact stain formed by placing the hand, with blood on the palm, on the carpet. The impression did not result from a mist of blood passing around, and through the fingers, of a hand at some elevation above the carpet.

Vincent DiMaio, M.D., also called by the defense, qualified as an expert in forensic pathology. He is the editor-in-chief of the periodical, *Gunshot Wounds.* In Dr. DiMaio's opinion, the manner of McQueen's death was suicide. He based this opinion on a number of factors, including the nature of the contact wound, the blood alcohol level, the absence of motive for murder,[3] and the gunshot residue (GSR).

In its rebuttal case, the State called Jonathan Arden, M.D., a medical examiner of twenty years experience. He testified that there were two major flaws in Dr. DiMaio's opinion. First, Dr. DiMaio did not account for the blood splatter evidence, particularly that on Smith's trousers. Second, the scene was "staged," in that there was no gun found at the scene.

### *Expert Testimony—GSR*

Gunshot residue consists of particles of three elements: antimony, barium, and lead. Under the circumstances at issue here, the only source of GSR was the primer of a handgun cartridge. The State's GSR expert, Alfred Schwoeble, explained that GSR particles are classified by the number of these elements that they contain. When all three elements are present in a particle, in a fused state, it is called "unique." When two of the elements are present in a particle, it is "consistent" with gunshot residue. If only one element is present in a particle, it is a "single."

Mr. Schwoeble's examination of the forensic evidence taken from McQueen and from Smith revealed that the back of

---

**3.** Based on McKay's testimony that McQueen no longer wanted to live with Smith, the State suggested to the jury in final argument that, on the fateful night, McQueen had so stated to Smith, who became "upset."

McQueen's right hand contained over twenty-five unique and over fifty consistent particles. There were 345 single particles. The palm of his right hand contained more than twenty-three unique particles, more than twenty-two consistent particles, and 570 singles. The back of Smith's right hand contained two unique, two consistent, and nineteen single particles, while the palm of his right hand contained three unique, three consistent, and twenty-one single particles.

Mr. Schwoeble further testified that activity was the greatest cause of loss of GSR particles from a hand.[4] Based on the GSR, Mr. Schwoeble was unable to conclude who the shooter was.

Dr. DiMaio based his opinion in part on the GSR forensics. He explained that while the absence of GSR is not proof that one is not the shooter, the presence of GSR is significant, and he found the number of unique particles on McQueen's hands to be "most[ ] interesting."

### Lay Evidence—
### McQueen's State of Mind

In its case-in-chief, and in rebuttal, the State presented a parade of witnesses who testified, *inter alia,* concerning McQueen's state of mind. McQueen's mother was the leadoff witness. She was asked:

"[STATE]: Was there anything, and I'm asking this question in the context of during the time he was in the military all the way up to the day he died, was there anything about Michael that you would think he was depressed, that he was depressed, anxious, suicidal, upset, anything?

"[MRS. McQUEEN]: Absolutely not."

She was not aware that McQueen had been arrested for DWI in Georgia in August. Mrs. McQueen talked on the telephone

---

4. Smith's hands were not bagged until the police arrived at the apartment, after he had been to the lake and back.

to her son two days before his death, and he did not seem depressed in that conversation.

The State called McQueen's father, and asked:

"Q.  At any time, in his life, especially during the last year or so, did you notice anything about Michael that would make you think that he was depressed or anxious or upset or even suicidal?

"A.  No."

McQueen's friend from the Rangers, Ronny McKay, with whom McQueen initially planned to live in the District of Columbia area, also testified concerning McQueen's state of mind.  He saw no signs suggesting that McQueen was depressed either in September of 2006, or "since [McQueen had] been back in June 2006" from his third deployment.  Similarly, Justin Jones, who first met McQueen at Ranger indoctrination in September 2003, testified that McQueen was, "[n]ot at all" depressed when the latter "came home in 2006."

Jones testified on the fifth trial day.  At the conclusion of his redirect examination, the State, at the bench, inquired whether the defense intended to produce the Georgia trooper who had arrested McQueen for DWI. The State was unwilling to bring Jones back from Texas to rebut the trooper's evidence and wished to put on, at that time, Jones's proof that McQueen was not unduly concerned about the DWI. The court excused the jury, and a lengthy conference ensued in which Smith pointed out that the State "went back a year."  The court told the defense that, "you're going to have to persuade me that [the trooper's evidence is] admissible."  The matter was left on the basis that counsel would attempt jointly to interview the trooper by telephone so that the court could more clearly be advised of the anticipated testimony.  Counsel were unable to reach the trooper.  When the jury returned, Jones testified, over objection, that McQueen was not unduly concerned over the pending DWI.

On the sixth day of trial, the court took up Smith's oral motion *in limine* that the trooper be permitted to testify. There was an extended argument.  Again Smith referred to

the State's evidence that went back "months and years, months and months[,] and a year or more" concerning McQueen's state of mind. The court considered the proffer to be that the trooper would testify that McQueen said (expletive reinserted): " 'I don't need this [shit] in my life at this point.' " Relying on *Robinson v. State*, 66 Md.App. 246, 503 A.2d 725, *cert. denied*, 306 Md. 289, 508 A.2d 489 (1986), discussed *infra*, the court ruled that the trooper's evidence was not trustworthy, was too remote, and was not relevant.

The defense, nevertheless, persisted. On the tenth trial day, Smith produced the arresting officer, John Hegger, in person.[5] His testimony was taken out of the presence of the jury. Officer Hegger testified that, after McQueen had been arrested and brought to the police station, and while the breathalyzer was warming up, he had a conversation with McQueen.

> "[APPELLANT'S COUNSEL]: Tell us about the conversation?
>
> "[OFF. HEGGER]: He basically appeared to be depressed, stressed about the situation, he was fidgeting. At one point, he, he put his hands down in his head, and he said this is the last thing I need in my life right now, on top of all the other, excuse my wording, other shit going on in my life.
>
> "And he kind of rested his head in his hands. And I, and I kind of just kept on doing my thing, and I said, you know, I understand, you'll get through it, kind of just trying to move along."

The court ruled that this testimony was inadmissible, reasoning, in relevant part, as follows:

> "This Court ruled that this testimony is not helpful, it is so remote from the factual situation that we have before this Court. It won't be helpful at all, that it was a traumatic experience, that I think it's a reasonable, I think I can take

---

5. Witness Hegger was a police officer of Acworth City, Georgia, a community about forty minutes northwest of Atlanta when he arrested McQueen.

a reasonable inference, nobody likes getting arrested for DWI.

"I've, in another life, arrested many people for DWI, many, more than this young man. And the notion that a person would say, I don't want this, can I get out of it, I've got a lot going on [in] my life, I don't want, I don't need this right now, and any such statement is hardly relevant in a case where it's alleged that someone took their own life."

In the State's rebuttal case, a number of Rangers testified on a number of points. Their testimony on McQueen's state of mind is reviewed below. William Burkett had been deployed four times with Smith. He had also been McQueen's supervisor in Afghanistan, where he had been in a social setting with McQueen "two, three, four times." Asked if McQueen appeared to be depressed when drinking, Burkett replied, "Not that I observed."

William Ryan was another supervisor of McQueen's in Afghanistan. Ryan served two deployments, beginning around May 2004 and ending in March 2006. He testified that, "[f]rom where we deployed, and having spen[t] time over the holidays, and all that, I was not worried about [McQueen's] emotional state." Steven Porto, a former Ranger, testified that he met McQueen in 2005. The witness was in social settings with McQueen "a little bit," because they "really didn't have a lot of time in the [S]tates." He was asked, "Did you ever see Mike McQueen after he had been drinking enough to where he maybe felt his liquor?" Porto said that McQueen could handle his liquor. Asked if, when McQueen was drunk, he appeared to be depressed, Porto testified, "Never."

In its opening summation to the jury, the State argued that "there is no evidence in this case that Michael McQueen was either depressed or suicidal." Further, the State argued:

"Nothing to indicate that he's a depressed individual when he drinks. He's morose? He's funny. Nobody in this case has been able to even suggest that he was depressed."

## Contentions

Smith submits that the proffered testimony of Officer Hegger was relevant and admissible. He cites *Case v. State,* 118 Md.App. 279, 702 A.2d 777 (1997), in which the issue was whether the manner of death was accident or homicide. There, the Court of Special Appeals determined that the decedent's state of mind was "of significant consequence" to that issue. *Id.* at 284, 702 A.2d at 779. This reasoning applies, *a fortiori* says Smith, to a murder/suicide issue. Smith also notes that *Case* did not even discuss the time frame within which the statements were made. Smith further contends that the statements made to Officer Hegger were not too remote to preclude admissibility and, citing *Snyder v. State,* 361 Md. 580, 762 A.2d 125 (2000), contends that remoteness goes only to the weight of the evidence. Smith also asserts that there was a "disparity in treatment of the two sides' evidence" relating to McQueen's state of mind, and that that disparity was "patently unfair and unduly prejudicial to Petitioner's defense." The exclusion was not harmless error because the testimony was of significant consequence to his foundational contention, Smith concludes.

The State's position begins with the principle that the admissibility of evidence is within the sound discretion of the trial court that should not be disturbed absent error or a clear abuse of that discretion. *Myer v. State,* 403 Md. 463, 476, 943 A.2d 615, 622 (2008). The State asserts that the excluded evidence is irrelevant because it was incompetent and remote.[6] It is said to be incompetent because "McQueen never said anything, directly or inferentially, to Officer Hegger about being suicidal or even entertaining suicidal thoughts." The statement to Officer Hegger, the State urges, "does not declare a state of mind or emotional predisposition at all, much less a suicidal one." It is "only a reaction to an

---

**6.** The State treats as the proffered evidence the circuit court's summary of the statements of counsel made on the sixth trial day. The operative proffer is Officer Hegger's testimony that later was taken out of the presence of the jury.

undesirable situation." From McQueen's reference to "other problems" in his life, it does not follow, says the State, that he was depressed or suicidal. Further, inasmuch as the other problems were not specified, the jury could only speculate as to whether they would be significant enough to cause McQueen to want to kill himself. Alternatively, the State posits that, even if the jury could legitimately discern a suicidal intent at the time of the statement to Officer Hegger, there was no evidence that permitted an inference that this same "ideation" existed at the time of the shooting one and one-half months later.

In addition to *Robinson*, 66 Md.App. 246, 503 A.2d 725 (1986), on which the circuit court and the Court of Special Appeals relied, the State also finds persuasive *Pettie v. State*, 316 Md. 509, 560 A.2d 577 (1989), discussed *infra*. On the harmless error issue, the State asks us to conclude that the evidence of Smith's guilt was overwhelming.

### Discussion

Officer Hegger's proffered testimony consists of two types of evidence. The first was Officer Hegger's direct observation, expressed as a "collective fact," see *Connor v. State*, 225 Md. 543, 552, 171 A.2d 699, 704 (1961), when he said that McQueen "basically appeared to be depressed, stressed about the situation[.]" The second type of evidence was McQueen's statement that, in effect, he did not need a DWI charge in addition to the other adversities or disappointments in his life. The statement was offered for the truth of its content, was hearsay, and was inadmissible, unless it fell within the exclusion provided in Maryland Rule 5–803(b)(3) for

> "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), offered to prove the declarant's then existing condition or the declarant's future action, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."

Both types of evidence must be relevant to be admissible. Md. Rule 5–402. As defined in Md. Rule 5–401, " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

"There are two components to relevant evidence: materiality and probative value." 1 *McCormick on Evidence* § 185, at 773 (4th Strong ed. 1992) (McCormick) (footnote omitted). A material proposition is also called a " 'consequential fact.' " 1 *Weinstein's Evidence* ¶ 401[03], at 401–10 (1980). "Materiality looks to the relation between the proposition for which the evidence is offered and the issues in the case." McCormick, § 185, at 773. Probative value is "the tendency of evidence to establish the proposition that it is offered to prove." McCormick, § 185, at 774.

### Materiality

■ The State asserts that Officer Hegger's testimony falls short of demonstrating that McQueen was going to commit suicide. That argument erroneously seeks to apply a sufficiency of the evidence type of standard to determine materiality. Here, the proposition Smith sought to prove was that the manner of McQueen's death was suicide. Officer Hegger's testimony need only have a "tendency" to make that proposition "more probable." Md. Rule 5–401. The State would have the materiality of Hegger's testimony determined in a vacuum, devoid of consideration of the other circumstances in the case. Here, at the time of the Hegger proffer, the defense had produced its forensic experts' testimony contradicting the State's opinion evidence. And, Dr. DiMaio had opined that the manner of death was suicide. The Hegger evidence makes it more probable, in conjunction with the opinions of the defense forensic experts, that the defense's ultimate proposition of suicide might be accepted.

"Under our system, molded by the tradition of jury trial and predominantly oral proof, a party offers his evidence not *en masse*, but item by item. An item of evidence, being

but a single link in the chain or proof, need not prove conclusively the proposition for which it is offered. It need not ever make that proposition appear more probable than not. Whether the entire body of one party's evidence is sufficient to go to the jury is one question. Whether a particular item of evidence is relevant to his case is quite another. It is enough if the item could reasonably show that a fact is slightly more probable than it would appear without that evidence. Even after the probative force of the evidence is spent, the proposition for which it is offered still can seem quite improbable. *Thus, the common objection that the inference for which the fact is offered 'does not necessarily follow' is untenable,* it poses a standard of conclusiveness that very few single items of circumstantial evidence ever could meet. A brick is not a wall."

McCormick, § 185, at 776 (footnotes omitted; emphasis added). The circuit court's ruling on the testimony of Officer Hegger rested, in part, on the court's prior experience as a police officer and its conclusion that arrests for DWI are not suicide inducing, so that the criticism above applies to that analysis as well. The proffered proof was material-consequential.

### Remoteness

■    When ruling on the testimony of Officer Hegger, the circuit court referred to its ruling when the proffer was based on the representations of counsel. In its brief, the State quotes at length from that ruling, as follows:

"'What we have here are approximately 30 days prior to Mr., prior to the demise of this young man in this case, he is alleged to have said to a state trooper who placed him under arrest for a DUI, something to the effect, I believe he used an explicative, deleted word, 'I don't need this in my life at this point.' And that is sought to be admitted in this case to show that he was despondent and that that despondency subsequently led to his suicide some 30 days later.

"'Well, let's see what the Court of Special Appeals says about that. First of all, I agree with [defense counsel] that

statements like that may be admitted into evidence, but the Court says if the case law legitimizing the admission of declarations based upon this notion of continuity in time of states of mind almost universally imposes a very tight limit on the lapse of time involved.

   " 'We have found no case and the appellate points us to none extending this notion to continuity over a period even approaching 30 days.  Here[,] in this case[,] it was between August the 4th and September the 3rd [*sic* ].  And then the [C]ourt goes on to say McCormick addresses this notion of relevance being strained beyond the breaking point.

*      *      *

   " 'And so, in reliance upon *Robinson v. State,* which I find to be as close to on point as any case, in fact it's the only case that could be arguably directly on point, the Court will not allow such a statement in.  I don't find it to be trustworthy.  There's no support for its trustworthiness and it is certainly far too remote in time for it to be admitted in evidence in this case.  Notwithstanding that, I don't find it to be, that particular statement or those statements to be relevant and for those reasons any such statements concerning the DWI will not be permitted.' "

The emphasis in this analysis is on remoteness, *i.e.,* part of the probative value aspect of relevancy.

   ■   We review for an abuse of discretion the exclusion of evidence on the ground of irrelevancy.  *See Martinez v. State,* 416 Md. 418, 420, 7 A.3d 56, 57 (2010) (holding that trial court abused its discretion in prohibiting accused from cross-examining attempted murder victim about his potential bias because State dismissed unrelated charges against victim); *Martin v. State,* 364 Md. 692, 695, 775 A.2d 385, 387 (2001) (holding that trial court's exclusion of proof that prosecution witness intended to file a civil lawsuit against accused was an abuse of discretion); *Calloway v. State,* 414 Md. 616, 637, 996 A.2d 869, 880 (2010) (holding that trial court abused its discretion in limiting defense's cross-examination of former cell mate about his hope of State's leniency); *State v. Cox,* 298

Md. 173, 184, 468 A.2d 319, 324 (1983) (holding that trial court abused its discretion when it sustained State's objection on relevancy grounds to cross-examination of victim about criminal assault charge brought against third party in separate incident and later recanted).

■ "A homicide victim's state of mind is unquestionably relevant to the defense theory that [the victim] committed suicide." *United States v. Veltmann,* 6 F.3d 1483, 1494 (11th Cir.1993). In that case, the deceased died in a fire caused by arson. The issue was whether the fire was set by the deceased or by her husband and son to collect life insurance. The alleged victim was addicted to prescription pain killers and was an abuser of alcohol. The district court had excluded testimony of a creditor and former paramour of the alleged victim that had been offered under Fed. R. of Evid. 803(3), on which Maryland Rule 5–803(b)(3) is based. The witness had testified on deposition that "[a] few months before she died, [the victim] talked to [the witness] about the possibility of her death, and instructed him to see [the victim's son] about being paid when she was gone. She mentioned suicide several times." *Id.* at 1489.

> The Eleventh Circuit reversed, holding that the testimony "was admissible under the state of mind exception, and while conceivably cumulative, its import was such that exclusion violated defendants' right to put on a defense. This abuse of discretion requires reversal."

*Id.* at 1493.

Relying on *In re Fill,* 68 B.R. 923 (Bankr.S.D.N.Y.1987), in which hearsay promises to repay a loan were admitted, despite having been made six years before actual repayment, and ultimately on *McCormick on Evidence* § 292, at 844–45 (Cleary 3d ed.1984), the Eleventh Circuit concluded that the continuity in time aspect of Fed.R.Evid. 803(3) must be determined " '*in light of all of the circumstances.*' " *Id.* at 1494. Applying that standard to the case before it, the court held:

> "Where one threatens suicide, talks about what should be done in [the] event of her death, and dies within months

under suspicious circumstances including the presence of a suicide note [7] and other witnesses corroborating her depression and suicidal ideation, we do not believe uncertainty over the exact date of the suicide threats should preclude admission of those statements to show state of mind."

*Id.* at 1494 (footnote omitted).

We agree with *Veltmann* and hold that, where possible suicide is an issue, remoteness of evidence, under Maryland Rule 5–803(b)(3), bearing on the deceased's state of mind, must be determined under all of the circumstances. Consequently, it was error for the circuit court to apply, based simply on the lapse of time, a limitation of thirty days preceding McQueen's death to the admissibility of Hegger's testimony.

*Veltmann* may also be analogized factually to the case before us. Although the content of the excluded telephone conversation between the victim and the former paramour included a reference to suicide, the time lag between that conversation and the victim's death was greater than that between McQueen's statements to Hegger and McQueen's death. Further, although a suicide note was ultimately found in *Veltmann*, the direct proof of suicide in the instant matter lies in the defense forensic testimony. We have already held, above, that the Hegger testimony need not have explicitly referenced suicide in order to be material.

There are other circumstances in the instant matter that bear on remoteness. The State announced in its opening statement that it would prove that McQueen was not suicidal. In its case-in-chief, the State produced lay witnesses who testified, based on observations going all the way back to McQueen's deployments in Afghanistan, that he was not depressed or suicidal. This set a standard, for purposes of this case, as to what the State considered to be proof that was not

---

7. The suicide note was found inside a picture frame by the victim's son approximately one and one-half years after her death. 6 F.3d at 1488 n. 9.

too remote to be probative. The State then opposed Smith's proffer that was based on personal observations made, and statements heard, less than two months before McQueen's death. Indeed, after the exclusion of the Hegger proffer, the State presented, in rebuttal, three lay witnesses who testified that, while on active duty, McQueen was not depressed, even though the jury never heard the Hegger evidence that was favorable to Smith.

On this aspect of the case, Smith submits that the circuit court's ruling operated unfairly, and we agree. This Court has recognized a principle of fundamental fairness in the trial of cases, and, in criminal causes, it has been applied for the benefit of the State and of the accused. *See Elliott v. State,* 417 Md. 413, 10 A.3d 761 (2010) (fundamental fairness required disclosure of State's confidential informant because it was necessary for the defense to prepare); *Dillard v. State,* 415 Md. 445, 3 A.3d 403 (2010) (fundamental fairness violated when, after two jurors, during recess, had commended police officer/prosecution witness on his investigation, trial court did not conduct *voir dire* to determine if the two jurors could reach an impartial verdict); *Mitchell v. State,* 408 Md. 368, 969 A.2d 989 (2009) (after defense, in closing argument, properly referred to the absence of testimony from specific individuals, the State, under the principle of fundamental fairness, could point to subpoena power available to the defense, even though "invited response" rule did not apply).

*Robinson v. State,* 66 Md.App. 246, 503 A.2d 725, does not persuade us to the contrary of the above conclusions. Jacqueline Robinson was convicted of assault with intent to disable and use of a handgun in the commission of a felony. The victim was her paramour. She had been quarreling with him in July 1984. The State, in its case, proved that she had applied for a handgun permit on August 4, picked up the handgun on September 1, and shot the victim on September 3, 1984. The defense was accident. On cross-examination of the gun dealer, Robinson was not permitted to elicit that she had told the dealer, on August 4, that she was purchasing the handgun to protect herself.

The primary basis for the Court of Special Appeals' affirmance was that the evidence was not reliable. The court agreed with the trial judge who said, " 'I don't think that a person when asked or when volunteering why they purchased a gun would indicate that they were doing it for the purpose of a homicide, if that were their purpose.' " *Id.* at 260–61, 503 A.2d at 732. The Court of Special Appeals recognized that the state of mind testimony had "secondary relevance" to the implied assertion in the State's proof that Robinson harbored a malicious intent on August 4. The court, however, concluded that the ruling fell within that band of trial court discretion where the ruling could go either way.

If a person, on day one, is angry enough to intend to shoot another person, it may well be that, because of the cooling off effect of the passage of time, a shooting occurring thirty days later may not manifest a continuation of that intent. We are not persuaded, however, that that rationale applies when the inquiry is the motive for suicide. The latter determination necessarily must consider all of the circumstances bearing on the victim's psyche. *Robinson* is not helpful here for the additional reason that it did not deal with evidence produced by the adversary addressed to a state of mind existing months, and even years, before the critical time, in order to prove continuation of that state of mind up to critical time.

For these reasons, we hold that the circuit court abused its discretion when it concluded that the proffered testimony was too remote to be relevant.

### Trustworthiness

■ The Court of Special Appeals also found the Hegger proffer unreliable, saying:

"Here the trial court specifically addressed the trustworthiness of the statements when it stated: 'I find there's just not one scintilla of evidence to suggest that the reaction to being arrested for a serious charge and comments made during that process [were] somehow related to any notions of suicide.' "

*Smith v. State,* 196 Md.App. at 521, 10 A.3d at 814. It appears to us that the above-quoted approach goes more to the materiality of the proffer than to its trustworthiness.

Trustworthiness in the subject context is explained in *Robinson* as follows:

> "The case law and the opinion writers are unanimous that with respect to this and any other spontaneous declaration, there must be assurances of reliability. 6 J. Wigmore, *Evidence* (3d ed.1940), § 1725, at 80, points out that such declarations, 'must appear to have been made in a natural manner and not under circumstances of suspicion.' McCormick [2d ed.1972] speaks to the same requirement, at 695:
>
>> " 'The special assurance of reliability for declarations of present state of mind rests, as in the case with declarations of bodily condition, upon their spontaneity and probable sincerity. This is assured by the requirements that the declarations must purport to relate to a condition of mind or emotion existing at the time of the statement and must have been made under circumstances indicating apparent sincerity.' "

66 Md.App. at 260, 503 A.2d at 732.

The State calls our attention to *Pettie v. State,* 316 Md. 509, 560 A.2d 577 (1989), a case involving the reliability of an attempted suicide that does not deal with a hearsay declaration of state of mind. While he was an inmate at the Maryland Correctional Training Center, Pettie was charged with sexual assault on another inmate. About six hours after the victim reported the incident to the prison authorities, a third inmate summoned a correctional officer to Pettie's cell. The third inmate stated that he had found a suicide note. Pettie was lying face down in his bunk, non-responsive but conscious, with a cut on his left wrist that bled only slightly. At trial, the State introduced evidence that Pettie attempted suicide, on the theory that it demonstrated consciousness of guilt. This Court reversed without reaching that issue. We pointed out that the State never introduced, directly or indirectly, any evidence of the content of the suicide note, there was no knife

in Pettie's hand or in his cell, and the wound bled only slightly. We concluded that "it is equally plausible, given the State's lack of evidence, that Pettie feigned attempted suicide to invite mitigation in the sentence he then served." *Id.* at 520, 560 A.2d at 582.

The State submits that, as in *Pettie,* the evidence of a suicidal state of mind based on the Hegger proffer is too ambiguous to be admissible. From the standpoint of reliability, we conclude that it is unlikely that McQueen's statement to Hegger was false and made for the purpose of obtaining favorable treatment from Hegger. When the statement was made to Hegger, McQueen had already been arrested and taken to the police station. Matters had progressed far beyond the point where Hegger could give McQueen a "break." The fact that McQueen's statement does not explicitly refer to suicide does not deprive it of the tendency to make suicide more probable.

For all the foregoing reasons, we conclude that the proffered Hegger evidence was admissible.

### Harmless Error

The Court of Special Appeals alternatively concluded that, if the Hegger proffer were admissible, the error in excluding it was nevertheless harmless. That court pointed to the forensic evidence produced by Smith and to his statement to the police that McQueen had killed himself. 196 Md.App. at 524, 10 A.3d at 814–15. From this, the court concluded that "there was a sufficient basis for the jury to determine whether McQueen died at his own hands or at the hands of appellant." *Id.* at 523, 10 A.3d at 815. This is not the correct standard, and it ignores the problem of persuasion of the trier of fact.

The Maryland standard for judging harmless error in a criminal case was articulated in *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976), in the following language:

"[W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief beyond a reasonable

doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict."

*Id.* at 659, 350 A.2d at 678 (footnote omitted).

In this case, the State produced evidence from which the jury could find consciousness of guilt on Smith's part based on temporarily disposing of the weapon, that he was the shooter based on the State's forensics, that McQueen, during his military career and during his terminal leave, never manifested depression or suicidal tendencies, and that Smith lied to the police. There was also evidence from which the jury could find that McQueen was the shooter, based on the defense forensics, and that there was no motive for Smith to kill McQueen. Because the relevant Hegger proffer was excluded, the State was able to argue to the jury that there was no evidence of depression or suicidal tendencies from anyone who had come in contact with McQueen. We are unable to conclude beyond a reasonable doubt that the error in no way influenced the verdict.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AND CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND TO REMAND THE CASE TO THAT COURT FOR A NEW TRIAL.**

**COSTS TO BE PAID BY MONTGOMERY COUNTY, MARYLAND.**