65 A.3d 221

**Drew PARA, et al.,**

**v.**

**1691 LIMITED PARTNERSHIP, et al.**

**No. 0657, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

May 1, 2013.

336

338

G. Macy Nelson, (David S. Lynch, on the brief), Towson, MD, for Appellant.

Emily A. Vainieri (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: KEHOE, HOTTEN and CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

HOTTEN, J.

This appeal involves the issuance of a permit by appellee, the Maryland Department of the Environment ("MDE" or "the Department"), to appellee, 1691 Limited Partnership ("1691"), for the construction of a "big-box" retail center on freshwater nontidal wetlands in Crofton, Anne Arundel Coun-

ty, Maryland.[1] 1691 is a Maryland limited partnership, in the business of land development, that owns parcels of land in and around Crofton, Anne Arundel County, Maryland.

As discussed in more detail, *infra*, both federal and State law maintain comprehensive programs for the "conservation, regulation, enhancement, creation, monitoring, and wise use of nontidal wetlands." Md.Code (1996, 2007 Repl.Vol.), § 5–903(a) of the Environmental Article. As a consequence, appellants, Drew Para, et al., challenged MDE's initial recommendation to issue 1691 a construction permit and argued that 1691 had neither presented substantial evidence of public need nor ruled out all other practicable alternative designs and locations for its proposed retail center.

Subsequent to MDE's initial recommendation, a contested case hearing was held before an Administrative Law Judge ("ALJ") with the Office of Administrative Hearings ("OAH"). The contested case hearing was held over six days in September and October of 2009. On December 30, 2009, the ALJ issued a detailed Proposed Decision and Order upholding MDE's issuance of the construction permit, with certain modifications.

Appellants filed exceptions to the ALJ's recommendations and, after a hearing before the Final Decision Maker for MDE ("FDM"), MDE issued its Final Decision and Order on June 29, 2010, denying all of appellants' exceptions and affirming the ALJ's proposed decision. Appellants subsequently filed a petition for judicial review before the circuit court,[2] which

---

1. A nontidal wetland is "an area that is inundated or saturated by surface water or groundwater at a frequency and duration sufficient to support, and that under normal circumstances does support, a prevalence of vegetation typically adapted for life in saturated soil conditions, commonly known as hydrophytic vegetation." Md.Code (1996, 2007 Repl.Vol.), § 5–901(i)(1) of the Environmental Article.

2. Md.Code (1996, 2007 Repl.Vol. & 2012 Supp.), § 5–204(f) of the Environmental Article, entitled, "Judicial review of final determination by Department[,]" in relevant part, provides:

further denied appellants' exceptions and affirmed the FDM's decision to issue a construction permit to appellees. Appellants noted an appeal to this Court, and presented seven questions for our review.[3] We have consolidated, rephrased, and reordered these questions, to the extent properly before this Court, as follows:

1. Whether the record lacked substantial evidence to support the FDM's decision that no practicable alternative existed for 1691's proposed development?

2. Whether the FDM erred in approving 1691's wetland's mitigation plan where 1691 traded land to the County rather than donating the land to the county when the wetland's

---

(1) A final determination by the Department on the issuance, denial, renewal, or revision of any permit issued ... is subject to judicial review at the request of any person that:
(i) Meets the threshold standing requirements under federal law; and
(ii) 1. Is the applicant; or
2. Participated in a public participation process through the submission of written oral comments, unless an opportunity for public participation was not provided.

3. In their brief, Appellants presented the following seven questions:
1. Whether, as a threshold matter, the record lacked substantial evidence supporting the FDM's decision that a public need existed for the development[?]
A. Whether hearsay evidence regarding the KLNB sales brochure, interest by national retailers, including Wal–Mart, in the site, and about BRAC was competent evidence of public need for the proposed development[?]
B. Whether evidence related to planning and zoning documents including the local area plan and the applicable zoning is relevant to the existence of public need for the proposed development[?]
C. Whether evidence related to the creation of a park is relevant to the existence of public need for the proposed development[?]
2. Whether the record lacked substantial evidence of the absence of a practicable alternative for the proposed development[?]
3. Whether the FDM erred legally when she ruled that COMAR's definition of "practicable" authorized 1691 to exclude an alternative because it would cost more to construct[?]
4. Whether the FDM erred in approving 1691's wetlands mitigation plan where 1691 traded land including wetlands to the County for land of comparable value rather than donating the land to the County when MDE's approval of the wetlands mitigation project expressly stated that 1691 would donate the land to the County for perpetual protection[?]

mitigation project stated that 1691 would donate the land to the County? [4]

For the reasons that follow, we shall affirm the judgment of the circuit court.

## I.

## STATUTORY BACKGROUND

In 1972, the United States Congress enacted the federal Clean Water Act ("CWA") to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (2008). As part of this enactment, Congress noted that nontidal wetlands are a crucial natural resource that assist in the purification of the Nation's open waters and additionally "provide habitat[s] for many plants and animals." *See* Richard H. McNeer, *Nontidal Wetlands Protection Maryland and Virginia*, 51 Md. L.Rev. 105, 106. Thus, protection of these wetlands, as important wildlife refuges, is a legitimate purpose for which the CWA was intended, *United States v. Akers*, 785 F.2d 814 (1986); and, as a consequence, "[t]he federal scheme, laid out in the [CWA], requires a developer to obtain a permit from the United States Army Corps of Engineers before filling wetland areas." McNeer, *supra*, 51 Md. L.Rev. at 106 (citing the Federal

---

4. Appellee, MDE, presents an additional question for our review, which states, "Did the Department properly determine that the purpose of the project as to construct a "big box" store, as opposed to retail more generally, when the record demonstrates that "big box" stores are a distinct commercial venture?" We, however, conclude that MDE's additional question is unpreserved and decline to address with specificity outside the context in which it is presented in appellants' issues. *Comptroller of the Treasury v. J/Port, Inc.*, 184 Md.App. 608, 642–643, 967 A.2d 253 (2009) (dismissing a cross-appeal for an appellee's failure to comply with Md. Rule 8-202(a), which requires a notice of appeal to be filed within thirty days after entry of the judgment or order from which the appeal is taken). *Cf. Maxwell v. Ingerman*, 107 Md.App. 677, 683–84, 670 A.2d 959 (1996) (noting that an untimely filed cross-appeal—or a failure to file a cross appeal—seeking to raise issues not otherwise presented in the appellant's appeal will be dismissed on the ground that the issues have not been properly preserved for appellate review).

Water Pollution Control Act Amendments of 1972, Pub.L. No. 92–500, 86 Stat., 816, as amended by the Clean Water Act of 1977, Pub.L. No. 95–217, 91 Stat. 1566 (codified as amended at 33 U.S.C. §§ 1251–1376 (2008)) (footnote omitted)). In addition, the CWA's 1977 amendments provide for an environmentally based program that delegates to state governments an option of permitting authority for discharges of dredging or fill material into the navigable waters and wetlands of the United States within that state's jurisdiction. 33 U.S.C. § 1344(g).

In response, Maryland's General Assembly enacted the Maryland Nontidal Wetlands Protection Act ("the Act"), Md. Code (1996, 2007 Repl.Vol.), §§ 5–901 through 5–911 of the Environmental Article, "[for] the purpose of establishing a statewide program for the conservation, enhancement, and regulation of nontidal wetlands in [the] State." S.B. 481, 399th Sess. (Md.1989). *See also* Md.Code (1996, 2007 Repl. Vol.), § 5–902(a) of the Environmental Article (noting that nontidal wetlands play an important role in the preservation and protection of the Chesapeake Bay and other waters of the State). *Cf.* Md.Code (1996, 2007 Repl.Vol.), § 16–102 *et seq.*, of the Environmental Article (outlining Maryland's purpose in protecting wetlands through the State generally). Since its enactment, the goal of the Act remains to prevent "overall loss in nontidal wetlands acreage and function and to strive for a net resource gain in nontidal wetlands over present conditions." Md.Code (1996, 2007 Repl.Vol.), § 5–902(b) of the Environmental Article.[5] The Act requires that persons who wish to conduct certain regulated activities within the nontidal wetlands apply for a MDE permit to lawfully engage in the regulated activity. Md.Code (1996, 2007 Repl.Vol.), § 5–906(b)(1) of the Environmental Article. Section 5–901(j)(1) of the Environmental Article classifies regulated activities as the following:

---

5. *See* McNeer, *supra,* 51 Md. L.Rev. at 125 (noting that "[t]he Nontidal Act was the first statute in the nation to express a goal of preventing net loss in nontidal wetland acreage and function.").

(i) The removal, excavation, or dredging of soil, sand, gravel, minerals, organic matter, or materials of any kind;

(ii) The changing of existing drainage characteristics, sedimentation patterns, flow patterns, or flood retention characteristics;

(iii) The disturbance of the water level or water table by drainage, impoundment, or other means;

(iv) The dumping, discharging of material, or filling with material, including the driving of piles and placing of obstructions;

(v) The grading or removal of material that would alter existing topography; and

(vi) The destruction or removal of plant life that would alter the character of a nontidal wetland.

Md.Code (1996, 2007 Repl.Vol.), § 5–901(j)(1) of the Environmental Article.

In general, however, MDE "may not issue a nontidal wetland permit for a regulated activity unless the Department finds that the applicant has demonstrated that the regulated activity" meets four criteria. Md.Code (1996, 2007 Repl.Vol.), § 5–907(a) *et seq.* of the Environmental Article. In order for the regulated activities to be permissible, they must either be "water dependent" or independent of water with no "practicable alternatives." Id. § 5–907(a)(1).[6] Further, the proposed regulated activity must "minimize alteration or impairment of

---

**6.** Section 5–907(b) requires that MDE consider the following factors in its evaluation of whether the proposed regulated activity has practicable alternatives:

(1) Whether the basic project purpose cannot be reasonably accomplished utilizing one or more other sites in the same general area that would avoid or result in less adverse impact on nontidal wetlands;

(2) Whether a reduction in size, scope, configuration, or density of the project as proposed and all alternative designs that would result in less adverse impact on the nontidal wetland would not accomplish the basic purpose of the project;

(3) In cases where the applicant has rejected alternatives to the project as proposed due to constraints such as inadequate zoning, infrastructure, or parcel size, whether the applicant has made reasonable attempts to remove or accommodate these constraints; and

the nontidal wetland, including existing topography, vegetation, fish and wildlife resources, and hydrological conditions." *Id.* § 5–907(a)(2). It must not "cause or contribute to a degradation of groundwaters or surface waters." *Id.* § 5–907(a)(3). Lastly, the proposed regulated activity must be consistent with "any comprehensive management plan that may be developed in accordance" with MDE's watershed management plans addressing nontidal wetland protection, creation, and restoration. *Id.* § 5–907(a)(4); Md.Code (1996, 2007 Repl.Vol.), § 5–908 of the Environmental Article.

In sum, Subtitle 5 of the Environmental Article demonstrates the legislature's efforts at balancing two important State interests. First, the General Assembly recognized the importance in protecting the Chesapeake Bay as one of the world's great estuaries that plentifully supplies blue crabs, clams, and oysters in its waters, in part, through the preservation of Maryland's nontidal wetlands. See *Md. Bd. Pub. Works v. Hovnanian's Four Seasons at Kent Island, LLC* ("*Hovnanian III*"), 425 Md. 482, 486, 42 A.3d 40 (2012); *Foley v. Hovnanian at Kent Island, LLC* ("*Hovnanian II*"), 410 Md. 128, 132, 978 A.2d 222 (2009). Second, the General Assembly acknowledged the importance of continued land development for regulated industries and population growth. It is through this lens that we now review the facts of the case at bar.

## II.

## FACTUAL AND PROCEDURAL HISTORY

### (A) 1691'S APPLICATION TO MDE.

On January 28, 2002, 1691 filed a permit application for construction in freshwater nontidal wetlands on property it

---

(4) The economic value of the proposed regulated activity in meeting a demonstrated public need in the area and the ecological and economic value associated with the nontidal wetland.
Md.Code (1996, 2007 Repl.Vol.), § 5–907(b) of the Environmental Article. *See* Part IV(B), *infra,* for further discussion of "practicable alternatives."

owns in the unincorporated area of Crofton, Anne Arundel County, Maryland (hereinafter referenced as "the property"). The property is approximately seventeen to twenty acres and fronts along the west side of Maryland Route 3. The nontidal wetlands within the property are primarily the result of past sand and gravel mining activity. Notwithstanding the nontidal wetlands on the property, it is zoned C–3 under the Anne Arundel County Code and designated for general commercial development. *See* ANNE ARUNDEL CNTY., Md., Code § 18–2–105 (2005).[7] Among the many permitted uses of a C–3 designated property is the development of business complexes, commercial recreational facilities, conference centers, schools, and department stores. ANNE ARUNDEL CNTY., Md., Code § 18–5–102 (2005) (outlining a comprehensive list of all permitted, conditional, special exception, and business complex auxiliary uses for C–3 zoned properties).

1691's application identified the proposed regulated activity as the development of a "big box" retail store greater than 130,000 square feet "with [an] associated parking lot and drives on the site of a former sand and gravel pit." According to 1691, the development required the "filling of [nontidal] wetlands[, removing vegetation, and building structures] to bring the site up to a grade height that will accommodate traffic from adjacent [Maryland Route] 3 and provide adequate area for the proposed development."

Moreover, 1691's application provided an alternative site analysis, explaining that alternative sites were rejected because they had failed to meet the project's purpose and maintained engineering and design constraints. Further, the application asserted that any alternative site would lead to greater wetlands impact. 1691 additionally explained that several building layouts and designs had been considered and rejected due to site access and safety or because they would have greater impacts on the nontidal wetlands.

---

7. C–3 designated areas require a minimum lot size of 10,000 square feet. ANNE ARUNDEL CNTY., Md., Code § 18–5–401 (2005).

MDE notified 1691 that the Department required additional information. Particularly, MDE requested that 1691 provide "a plan view showing the limits of the 100–year floodplain and the areas of the floodplain that w[ould] be impacted by the development of the site," and an approximate amount of fill that would be placed within that floodplain. In addition, MDE requested that 1691 provide "[a] detailed avoidance and minimization analysis," and a specific "alternative sites analysis[.]"

1691 complied and provided MDE a site plan illustrating the limits of the 100–year floodplain and its potential impacts. 1691 explained that the proposed development was located and designed to avoid and reduce impacts "as much as reasonably practical." 1691 additionally noted that the configuration and size of the wetlands did not permit total avoidance if demands of County parking codes and traffic safety were to be satisfied. As a consequence, 1691 provided a series of methods that it used to avoid and minimize impacts to regulated areas:

1. The proposed size of the retail store footprint on the site has been reduced in order to reduce parking requirements, improve traffic flow, and reduce the total amount of impervious surface[.]

2. The configurations of the wetland and floodplain boundaries allow for more development on this site than is proposed, however, service drives and access areas have been reduced to the minimum that will allow safe and reasonable access to the building[.]

3. Retaining walls and other construction methods have been incorporated into the design of the project in order to avoid and minimize impacts to regulated areas while producing sufficient buildable area[.]

4. The [development] has been swept around the upland side of the floodplain limits rather than closely following the limits, providing a buffer between the floodplain and the edge of the development in many places.

5. Design and placement of stormwater control devices will help minimize hydrological impacts on the on-site (non-swamp) wetlands.

1691 also submitted a copy of the Crofton Small Area Plan ("CSAP") and argued that the site plan formed with the CSAP. Further, 1691 asserted that it was "striving" to conform with the goals within the CSAP by "dedicating acreage to the [ ]Community for a 'passive' park" to preserve "environmental features" and by constructing a development that "provides for the service and business needs of" Crofton. 1691 additionally indicated that the minimal acreage designated for commercial zoning by CSAP provided for few alternatives, regardless of tract size.

On August 21, 2002, MDE acknowledged that the property's wetland configurations made it exceptionally difficult to develop without any adverse impact. Nonetheless, MDE requested detailed information regarding alternative designs and reasons why those designs had been rejected. Expressing some doubt, MDE added that although the CSAP indicates the property "is the appropriate area for the expansion of commercial development, it does not require a 'big box' retail design." Therefore, MDE ordered 1691 to examine additional locations "where the projected purpose can be accomplished."

On October 11, 2002, 1691 provided a detailed alternative site and design analysis that ultimately concluded that other designs would lead to greater impact to the wetlands. As a consequence, 1691 argued that its preferred property remained the only practicable location for the geographic market. Satisfied with 1691's response regarding avoidance, minimization, mitigation, and stormwater management proposals, MDE notified 1691 that its application was complete. MDE did, however, request clarification regarding the minimum and maximum sizes of a "big box" store and the maximum number of parking spaces required for such a store. In addition, MDE inquired whether the wetlands and buffers on the south side of the property could be preserved with a smaller retail facility.

While MDE awaited 1691's answer, it gave public notice of the application and opportunity to submit written comments or request a public informational hearing. No comments were

filed and no request for a hearing was submitted to MDE based upon the public notice.

On January 24, 2003, 1691 submitted a memorandum outlining its responses. 1691 indicated that the maximum size of a "big box" facility was in the range of 150,000 to 175,000 square feet. 1691 assured MDE, however, that its three years of research demonstrated that the smallest acceptable facility was approximately 142,000 square feet. 1691 further informed MDE that, after considering both county requirements and the facility's requirements, that 786 parking spaces were needed. 1691 assured MDE that it had rejected requests for additional parking spaces because it was committed to minimizing environmental impacts to the nontidal wetlands on the property. Regarding MDE's third question, 1691 insisted that the wetlands' confirmation did permit for avoidance beyond the proposed plan "given parking, traffic flow, site access, and safety requirements." Thus, 1691 rejected alternative designs and smaller configurations as a result of demographics in the Crofton area.

In light of 1691's answers to MDE's questions, and given the lack of comments or requests for a public hearing during the public notice period, MDE approved 1691's Nontidal Wetlands and Waterways Permit on April 15, 2003. MDE did note, however, that its decision was subject to authorization from the United States Army Corps of Engineers.

### (B) The Public Attention and Controversy.

Following MDE's decision, 1691 announced Wal–Mart as the prospective end-user for the development. Suddenly, the degree of public interest increased significantly, prompting MDE to provide an additional comment period in the fall of 2006, staying the permit's issuance. In addition, a public hearing was held on November 13, 2006.

Based on the comments received, MDE requested that 1691 address five additional questions. First, MDE addressed inconsistencies between the alleged and actual impacts the development would have on the 100–year floodplain. There-

fore, MDE required 1691 to resolve its concerns by submitting an amended floodplain study providing the actual amount of fill required. Second, MDE required that 1691 submit full-sized stormwater management ("SWM") plans and to address the discovery of two additional stormwater discharge structures outside the proposed limit of disturbance to the nontidal wetlands. Third, MDE requested that 1691 provide complete sediment and erosion control plans for the property. Fourth, 1691 was asked to provide copies of the wetland delineation sheets and soil borings for the entire property. Lastly, MDE required 1691 to provide additional details regarding 1691's avoidance and minimization of impacts to the property.

Both Wal–Mart and 1691 responded to MDE's requests. Wal–Mart alleged that it had made extensive efforts to minimize the impact of the project by reducing the overall footprint of the building by twenty-five percent, reducing the paved area by fifteen percent, and reducing the fill proposed for the property's floodplain and nontidal wetlands to twenty-five percent. As a result, the footprint of the store would be "only slightly larger" than a two-story design created for an urban environment. Wal–Mart further explained that even if the two-story design reduced the size of the store's footprint, "a significant parking field would still be required under the requirements of the Anne Arundel County Code." Therefore, "only negligible reduction in wetlands impact would result." An identical explanation was offered for the tiered parking. Wal–Mart also noted that even after reducing the building footprint, traffic flow requirements of the State Highway Administration "restrict[ ] any benefits otherwise attributable to the use of a slightly smaller footprint." Thus, it concluded that any impact reduction would be minimal to non-existent, providing "negligible benefits" at higher costs of construction.

1691 argued that the fill volumes and environmental impacts were recalculated based on the most current SWM and sediment and erosion control plans. These plans, it asserted, were compliant with industry standards. To illustrate the argument, it enclosed a copy of the SWM plans for the entire project. 1691 noted that the increased wetland and floodplain

impacts from the outfall designs discharged the stormwater directly into the river. Lastly, 1691 explained that impacts to cranberry on the property were unavoidable.

Following MDE's review of these materials, MDE issued 1691 its permit on January 28, 2009. Two days later, on January 30, 2009, the Department issued notice of the permit, attaching an explanation of its decision. Within its explanation, MDE noted that the proposed "big box" retail operation satisfied the intent of the CSAP by "allowing Crofton residents to save time, fuel and money, without duplicating existing services or displacing local businesses."

Regarding 1691's alternative's analysis, MDE acknowledged that 1691 had considered other properties in the market area too small to accommodate a "big box" store. Additionally, it noted that the other sites had no access to public utility service, were not proximate to existing roads, and were unavailable to purchase. As a consequence, MDE concluded that the alternative site analysis was sufficient and proceeded with an explanation of 1691's proposed avoidance and minimization of adverse impacts. The Department noted that the wetlands were a byproduct of sand and gravel mining. Further, MDE determined that no rare, threatened, or endangered species existed as "permanent residents on the project site." The Department acknowledged, however, that native cranberry had been located on the property and was removed subsequently to preserve the species genotype. The removed plants would be used at the Turner Environmental Park and at other restoration sites by Anne Arundel County Public Schools. As a consequence, MDE determined that preservation of the narrow nontidal wetlands on the property would prohibit adequate use of the property. The department further stated:

> ... While these wetlands do connect to forested wetlands in the 100–year floodplain of the Little Patuxent River, there is a significant length (500 feet +) between the wetlands to be impacted and the river itself.

... [O]nce the applicant has a contract purchaser, MDE will require final, engineered construction plans demonstrating that further avoidance and minimization of nontidal wetlands and their 25–foot buffer, and nontidal waterways, including the 100–year nontidal floodplain, are not possible.

Therefore, MDE concluded that its findings merited the issuance of the permit.

### (C) APPELLANTS' CHALLENGES TO THE PERMIT.

On February 13, 2009, appellants, filed a petition for a formal contested hearing regarding MDE's decision to issue the Nontidal Wetlands and Waterways Permit to 1691. MDE referred appellants' petition to OAH. Over a period of six days, an ALJ for OAH held a contested case hearing in September and October of 2009. The parties offered testimony from thirteen witnesses. Nine of the witnesses were qualified as experts in a variety of areas, including, wetlands ecology, land use and planning, and retail market analysis. The ALJ accepted seventy documents arising out of 1691's application for a Nontidal Wetlands and Waterways Permit.

On December 30, 2009, the ALJ issued a sixty page Proposed Decision and Order, which upheld MDE's issuance of the construction permit, with certain modifications. Appellants subsequently filed Exceptions with the OAH. MDE and 1691 filed memoranda in opposition. Thereafter, the parties presented argument to the FDM on June 2, 2010. Following argument, the FDM denied appellants' exceptions and ordered that the Proposed Decision and Order of the ALJ be affirmed on June 29, 2010.

On July 19, 2010, appellants filed a petition for judicial review of the FDM's Final Decision with the Circuit Court for Anne Arundel County. Following argument, the circuit court further denied appellants' exceptions and affirmed the FDM's decision.

Additional facts will be supplied *infra* as they bear on a discussion of the issues.

## III.

## STANDARD OF REVIEW

" 'On appellate review of a decision of an administrative agency, this Court reviews the agency's decision, not the circuit court's decision.' " *Long Green Valley Ass'n v. Prigel Family Creamery*, 206 Md.App. 264, 273, 47 A.3d 1087 (2012) (quoting *Halici v. City of Gaithersburg*, 180 Md.App. 238, 248, 949 A.2d 85 (2008)). As with the review of any administrative agency decision, this Court looks to three things: (1) whether the agency's findings were supported by substantial evidence in the record made before the agency; (2) whether the agency committed any substantial error of procedural or substantive law in the proceeding or in formulating its decision; and (3) whether the agency acted arbitrarily or capriciously in its application of the law to the facts. *Hovnanian III*, 425 Md. 482, 514, 42 A.3d 40 (2012).

"We review the final decision of the administrative agency in accordance with the well established principles of administrative law." *Neutron Products, Inc. v. Dep't of Ev't* ("*Neutron* "), 166 Md.App. 549, 581–82, 890 A.2d 858 (2006) (citations omitted). The task of this Court is "not to substitute its judgment for the expertise of those persons who constitute the administrative agency." *Bd. of Physician Quality Assurance v. Banks*, 354 Md. 59, 68, 729 A.2d 376 (1999) (quotation marks omitted). Thus, it is well-settled that the agency may "use its experience, technical competence, and specialized knowledge in the evaluation of evidence." Md.Code (1984, 2009 Repl. Vol.), § 10–213(i) of the State Government Article. *See Md. Aviation Admin. v. Noland*, 386 Md. 556, 573 n. 3, 873 A.2d 1145 (2005) (recognizing that we give "considerable weight" to an agency's "interpretations and applications of statutory regulatory provisions" that are administered by the agency); *Oltman v. Md. State Bd. of Physicians*, 162 Md.App. 457, 482, 875 A.2d 200 (2005).

" '[I]t is the **final** order of the administrative agency that is subject to deferential judicial review.' " *Carriage Hill*

*Cabin John, Inc. v. Md. Health Res. Planning Comm'n,* 125 Md.App. 183, 220, 724 A.2d 745 (1999) (quoting *Dep't of Health & Mental Hygiene v. Shrieves,* 100 Md.App. 283, 296, 641 A.2d 899 (1994)) (emphasis added). As a consequence, it is the decision of the FDM that is subject to review before this Court. *Neutron,* 166 Md.App. at 582, 890 A.2d 858. In that regard, we adhere to this Court's prior explanation of our review of a final agency decision following the decision of an ALJ:

> Despite that procedural posture, **it remains the agency's final decision, not the ALJ's decision, that we review for substantial evidence**.... More precisely, **this Court's** " **'job'** [is] not to assess the 'rationality' of or evidentiary basis for the ALJ's recommendation; it **[is] to assess the rationality or evidentiary basis of the agency's ... final order.**"

*State Comm'n on Human Relations v. Kaydon Ring & Seal, Inc. ("Kaydon"),* 149 Md.App. 666, 692, 818 A.2d 259 (2003) (citations omitted) (emphasis added), *quoted in Neutron,* 166 Md.App. at 582, 890 A.2d 858.

"While the agency itself makes factual findings, and we review the agency's decision, rather than that of the hearing examiner, the agency is supposed to take into consideration the factual findings made by the ALJ." *Neutron,* 166 Md.App. at 582, 890 A.2d 858 (quoting *Kaydon,* 149 Md.App. at 693, 818 A.2d 259) (internal quotations omitted). Thus, when the ALJ renders factual findings based on an assessment of credibility, " 'the agency should give appropriate deference to the opportunity of the [ALJ] to observe the demeanor of the witnesses,' and the agency should reject credibility assessments **only if** it gives 'strong reasons' " *Kaydon,* 149 Md.App. at 693, 818 A.2d 259 (citations omitted) (emphasis added). Therefore, judicial review of the agency's findings of fact is highly deferential. *Id.* "In this context, ' "[s]ubstantial evidence," as the test for reviewing factual findings of administrative agencies, has been defined as "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion[.]"'" *Catonsville Nursing Home, Inc. v. Loveman,* 349 Md. 560, 569, 709 A.2d 749 (1998) (quoting *Bulluck v. Pelham Wood Apts.,* 283 Md. 505, 512, 390 A.2d 1119 (1978)).

 When an agency's conclusion of law is based on a legal interpretation of a statute it administers or of its own regulations, the agency is entitled to some deference from the reviewing court. *Charles Cnty. Dep't of Soc. Servs. v. Vann,* 382 Md. 286, 295–96, 855 A.2d 313 (2004). Nevertheless, in this Court's determination of legal error, our review of the agency's legal conclusions are less deferential. *Hovnanian III,* 425 Md. at 514, 42 A.3d 40. "[R]eviewing courts are under no constraint to affirm an agency decision premised solely upon an erroneous conclusion of law." *Ins. Comm'r v. Engelman,* 345 Md. 402, 411, 692 A.2d 474 (1997), quoted in *Loveman,* 349 Md. at 569, 709 A.2d 749. *See also Spencer v. Board of Pharmacy,* 380 Md. 515, 846 A.2d 341 (2004); *Bayly Crossing v. Consumer Protection,* 417 Md. 128, 9 A.3d 4 (2010). Thus, we may reverse an agency's decision supported by erroneous legal conclusions. *Loveman,* 349 Md. at 569, 709 A.2d 749.

 Other agency decisions, however, are mixed questions of law and fact. Thus, "[w]hen the agency decision being judicially reviewed is a mixed question of law and fact, the reviewing court applies the substantial evidence test, that is, the same standard of review it would apply to an agency factual finding." *Vann,* 382 Md. at 296, 855 A.2d 313 (citations omitted). If substantial evidence exists, "the matter is considered to be fairly debatable and the courts may not substitute their judgment for that of the [agency] which is presumed to exercise a degree of expertise" in reaching conclusions on the matters presented before it. *Boehm v. Anne Arundel Cnty.,* 54 Md.App. 497, 514, 459 A.2d 590 (1983) (quoting *Neuman v. City of Baltimore,* 23 Md.App. 13, 14, 325 A.2d 146 (1974)).

## IV.

## DISCUSSION

**(A) The FDM's Decision that No Practicable Alternative Existed.**

Appellants contend that the FDM erred in conducting the requisite practicable alternative analysis pursuant to Md.Code (1996, 2007 Repl.Vol.), § 5–907(b) of the Environmental Article[8] and that the administrative record lacked substantial evidence that no practicable alternative existed for the proposed project for two reasons. First, appellants argue that the FDM erred in ruling that COMAR's definition of "practicable" authorized 1691 to exclude an alternative design for its project because it would cost more to construct. Thus, appellants insist that "[t]he FDM erred because she interpreted that law to allow 1691 to rule out an alternative [design] *solely* on the basis of cost." (emphasis in appellants' brief). Second, appellants assert that the record lacked substantial evidence supporting the FDM's and ALJ's decisions that a public need existed for the development.

As observed briefly in Part I, *supra,* Section 5–903 of the Maryland Environmental Article authorizes MDE to enforce a statewide program for "conservation, regulation, enhancement, creation, monitoring, and wise use of nontidal wetlands." Md. Code (1996, 2007 Repl.Vol.), § 5–903(a) of the Environmental Article. One such duty delegated to MDE in order to enforce the statewide program is to "[e]valuate proposed activities on nontidal wetlands and grant or deny permits or other approvals of proposed activities." *Id.* § 5–903(b)(4). In that regard, MDE's decision to issue a permit is based on enumerated preconditions provided within Section 5–907 of the Maryland Environmental Article. Specifically, the statute provides:

(a) In general.—The Department may not issue a nontidal wetland permit for a regulated activity unless the Depart-

---

8. *See* statutory language provided *infra.*

ment finds that the applicant has demonstrated that the regulated activity:

(1) (i) Is water dependent and requires access to the nontidal wetland as a central element of its basic function; or

(ii) **Is not water dependent and has no practicable alternative;**

(2) Will minimize alteration or impairment of the nontidal wetland, including existing topography, vegetation, fish and wildlife resources, and hydrological conditions;

(3) Will not cause or contribute to a degradation of groundwaters or surface waters; and

(4) Is consistent with any comprehensive management plan that may be developed in accordance with § 5–908 of this subtitle.

**(b) Practicable alternatives.—The applicant shall demonstrate to the satisfaction of the Department that practicable alternatives have been analyzed and that the regulated activity has no practicable alternative. In evaluating whether the proposed regulated activity has a practicable alternative, the Department shall consider:**

(1) Whether the basic project purpose cannot be reasonably accomplished utilizing one or more other sites in the same general area that would avoid or result in less adverse impact on nontidal wetlands;

(2) **Whether a reduction in the size, scope, configuration, or density of the project as proposed and all alternative designs that would result in less adverse impact on the nontidal wetland would not accomplish the basic purpose of the project;**

(3) In cases where the applicant has rejected alternatives to the project as proposed due to constraints such as inadequate zoning, infrastructure, or parcel size, whether the applicant has made reasonable attempts to remove or accommodate these constraints; and

(4) **The economic value of the proposed regulated activity in meeting a demonstrated public need in the area**

**and the ecological and economic value associated with the nontidal wetland.**

Md.Code (1996, 2007 Repl.Vol.), § 5–907 of the Environmental Article (emphasis added).

Admittedly, the statute, *supra,* and its accompanying regulations express a strong preference for wetland protection. *See also* Md.Code (1996, 2007 Repl.Vol.), § 5–903 of the Environmental Article (". . . . The goal of the program shall be to attain no net overall loss in nontidal wetland acreage and function and strive for a net resource gain in nontidal wetlands over present conditions."); COMAR 26.23.02.01.A ("A person may not conduct a regulated activity in a nontidal wetland, or within a buffer or expanded buffer, unless the Department has issued a permittor letter of exemption."). "It would hardly be putting the case too strongly to say that the Clean Water Act[, Maryland Nontidal Wetlands Protection Act,] and the applicable regulations do not contemplate that wetlands will be destroyed simply because it is more convenient than not to do so." *Buttrey v. United States,* 690 F.2d 1170, 1180 (5th Cir.1982), *quoted in Nat'l Wildlife Fed'n v. LTC Whistler,* 27 F.3d 1341, 1344 (8th Cir.1994). Therefore, "[f]urther degradation and loses of nontidal wetlands due to human activity [should] be prevented wherever possible[.]" Md.Code (1996, 2007 Repl.Vol.), § 5–902(b)(2) of the Environmental Article.

As a consequence, applicants seeking to conduct regulated activities that are not water dependent must demonstrate that the proposed project within the nontidal wetlands "has no practicable alternative." Md.Code (1996, 2007 Repl.Vol.), § 5–907(a)(ii) of the Environmental Article. MDE defines a "practicable" alternative as an alternative that is "available and capable of being done after taking into consideration costs, existing technology, and logistics in light of overall project purposes." COMAR 26.23.01.01.B(69). This definition is synonymous with the United States Army Corps of Engineers' ("Corps") definition for "practicable alternative." *Compare* COMAR 26.23.01.01.B(69) *with* 40 C.F.R. § 230.10(a)(2). *See also Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army*

*Corps of Eng'r,* 702 F.3d 1156, 1165 (10th Cir.2012) (quoting the Corps' definition provided in C.F.R. § 230.10(a)(2)); *Sierra Club v. Van Antwerp,* 661 F.3d 1147, 1150 (D.C.Cir.2011) (observing the Corps' definition of practicable alternative); *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'r,* 524 F.3d 938, 947 (9th Cir.2008) (noting the Corps' definition); *Sylvester v. U.S. Army Corps of Eng'r,* 882 F.2d 407, 408 (9th Cir.1989); *La. Wildlife Fed'n, Inc. v. York,* 761 F.2d 1044, 1047 (5th Cir.1985).

The practical alternatives analysis is comprised of two steps. First, MDE must define the "project['s] purpose," or, rather, the "principal reason for conducting all regulated activities and other activities on the project site." COMAR 26.23.01.01.-B(72). Second, the Department must then consider four sub-factors: (1) whether "the basic project purpose cannot be reasonably accomplished utilizing one or more other sites in the same general area that would avoid or result in less adverse impact on nontidal wetlands[;]" (2) whether "a reduction in the size, scope, configuration, or density of the project as proposed and all alternative designs that would result in less adverse impact on the nontidal wetland would not accomplish the basic purpose of the project[;]" (3) "[i]n cases where the applicant has rejected alternatives to the project as proposed due to the constraints such as inadequate zoning, infrastructure, or parcel size, whether the applicant has made reasonable attempts to remove or accommodate these constraints; and (4) [t]he economic value of the proposed regulated activity in meeting a demonstrated public need in the area and the ecological and economic value associated with the nontidal wetland." Md.Code (1996, 2007 Repl.Vol.), § 5–907(b) of the Environmental Article.

In the instant case, because appellants are contesting only the design of 1691's proposed project and whether there was a demonstrated public need for the project, we are under no obligation to further consider Sections 5–907(b)(1) and (3) of the Environmental Article, provided *supra.* We shall, therefore, address both of appellants' arguments regarding the

FDM's application of Sections 5–907(b)(2) and (4) respectively and conclude that both arguments are without merit.[9]

(1) THE FDM'S FINDING THAT NO ALTERNATIVE DESIGNS WOULD RESULT IN LESS ADVERSE IMPACT ON THE NONTI-DAL WETLANDS WHILE ACCOMPLISHING THE PROJECT'S BASIC PURPOSE.

 A practicable alternative exists when the alternative is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." COMAR 26.23.01.01.B(69). *See also* 40 C.F.R. § 230.10(a)(2) (providing the same definition for a harmonious analysis under the CWA). To be sure, where the projected purpose associated with a regulated activity as provided within Section 5–901(j)(1) of the Environmental Article is located on nontidal wetlands but does not require access or proximity to water (i.e. is not "water dependent"), practicable alternatives that do not involve nontidal wetlands are presumed to be available unless clearly demonstrated otherwise. *See* Md.Code (1996, 2007 Repl.Vol.), §§ 5–907(a)(1)(ii), (2), (3), & 4. *See also* 40 C.F.R. § 230.10(a)(3); *York, supra,* 761 F.2d at 1047; *Sylvester, supra,* 882 F.2d at 409 (citing *La.*

---

9. In their brief, appellants concede that the FDM correctly analyzed the law in concluding that no practicably alternative locations for 1691's proposed project existed and in concluding that the applicant made reasonable attempts to remove or accommodate inadequate zoning, infrastructure, or parcel restraints pursuant to Md.Code (1996, 2007 Repl.Vol.), §§ 5–907(b)(1) & (3) of the Environmental Article.

As a consequence, we decline to exercise consideration of an issue rendered an abandoned contention by appellant's failure to present it in his brief and failure to present it with particularity. Md. Rule 8–504(a) (brief shall contain "[a]rgument in support of the party's position"). *See Poole v. State,* 207 Md.App. 614, 633, 53 A.3d 479 (2012) (declining to address argument not presented with particularity when appellant presented the argument in a one-sentence footnote); *Assateague Coastkeeper v. Md. Dep't of the Env't,* 200 Md.App. 665, 667 n. 4, 28 A.3d 178 (2011) ("Appellants failed, however, to present any argument on this issue. Therefore, we will not address it."), *cert. denied,* 424 Md. 291, 35 A.3d 488 (2012); *Honeycutt v. Honeycutt,* 150 Md.App. 604, 618, 822 A.2d 551 (refusing to address argument because appellants failed to adequately brief the argument), *cert. denied,* 376 Md. 544, 831 A.2d 4 (2003).

*Wildlife Fed'n, Inc. v. York,* 603 F.Supp. 518, 527 (W.D.La. 1984), *aff'd in part and vacated in part,* 761 F.2d 1044 (5th Cir.1985)).[10] Therefore, the first step in this practicable alternatives analysis is to define the "project purpose," or, rather, "the principal reason for conducting all regulated activities and other activities on a project site." COMAR 26.23.01.01.-B(72). Only after the "project purpose" is defined can one objectively determine whether the project is, in fact, water dependent or independent of water.

In the instant case, the project purpose, as proposed by the applicant and as additionally accepted by MDE, is the "construction of a 'big box' store and its required infrastructure." Appellants fault the Department for accepting 1691's definition of "project purpose," which they contend illegitimately restricted MDE's ability to require further reductions in wetland impacts. Indeed, had MDE rejected 1691's proposed project purpose and alternatively defined the purpose more generally as only a non-descriptive, commercial development, as opposed to a "big box store" or "warehouse-type store" for a single tenant, an alternative design *may* have been built on the site and that *may* have impacted the wetlands to a lesser degree. That potentially smaller commercial project, however, would not, as required by Section 5–907(b)(2), accomplish the "basic purpose" of the project as provided by 1691 in its application to the Department.

Defining the term "project purpose" begins with the applicant's purpose. While there is no Maryland case law on point, the United States Courts of Appeal have explicitly observed that, pursuant to the analogous federal wetlands permitting program administered by the Corps, it is not only "permissible for the Corps to consider the applicant's objective; the Corps has a duty to take into account the objectives of the applicant's project." *York,* 761 F.2d at 1048. *See also Hillsdale Envtl.*

---

**10.** Nonetheless, "classification of an activity as 'non-water dependent' does not serve as an automatic bar to issuance of a permit ... [it] simply necessitates a more persuasive showing than otherwise concerning the lack of alternatives." *York,* 603 F.Supp. at 527. *See* Md.Code (1996, 2007 Repl.Vol.), § 5–907(b) of the Environmental Article.

*Loss Prevention, Inc. v. U.S. Army Corps of Eng'r ("Hills-dale ")*, 702 F.3d 1156, 1170 (10th Cir.2012) (citing *Sierra Club v. Van Antwerp*, 661 F.3d 1147 (D.C.Cir.2011)); *Butte Envtl. Council v. U.S. Army Corps of Eng'r*, 620 F.3d 936, 946 (9th Cir.2010) ("But 'the Corps has a duty to consider the applicant's purpose,' where, as here, that purpose is 'genuine and legitimate.' ") (quoting *Sylvester, supra*, 882 F.2d at 409). Thus, by analogy, "it would be bizarre if the [Department] were to ignore the purpose for which ... [1691 sought] a permit and ... substitut[ed] a purpose it deemed more suitable." *York*, 761 F.2d at 1048 (relying, generally, on *Hough v. Marsh*, 557 F.Supp. 74 (D.Mass.1982)).

"Obviously, an applicant cannot define a project in order to preclude the existence of any alternative sites and[,] thus[,] make what is practicable appear impracticable." *Sylvester*, 882 F.2d at 409. Rather, "the applicant's purpose must be 'legitimate.' " *Id.* (citing *Friends of the Earth v. Hintz*, 800 F.2d 822, 833–34 (9th Cir.1986)). *See also Van Antwerp*, 661 F.3d at 1153 ("There appears to be little judicial interpretation of th[is] process, but it has yielded one constraint that seems logically necessary: '[A]n applicant cannot define a project in order to preclude the existence of any alternative sites.' "). "Yet, in determining whether an alternative site [or design] is practicable, the [Department] is not entitled to reject [1691's] genuine and legitimate conclusion that the type of [design] it wishes to construct is economically advantageous[,]" in compliance with current county planning and zoning, and allows Crofton residents to save time, fuel and money, without duplicating existing services or displacing local businesses. *See Sylvester*, 882 F.2d at 409.

 Nonetheless, an alternative site or design does not have to accommodate components of a project that are merely "incidental" to the applicant's basic purpose. *See, e.g., Shore-line Assocs. v. Marsh*, 555 F.Supp. 169, 179 (D.Md.1983), *aff'd without decision*, 725 F.2d 677 (4th Cir.1984). For example, in *Shoreline*, the Corps refused to issue a permit to a developer for building a number of waterfront town houses together

with a boat storage and launching facility. 555 F.Supp. at 171. There, the developer contended before the United States District Court for the District of Maryland that, because its project was designed to maintain a park-like atmosphere of the upland areas and because the project is dependent on construction of the boat storage and launch area, the Corps' proposed alternative site for the town houses was "untenable." *Id.* at 179. The district court upheld the Corps' denial of the permit, observing that the boat facilities were merely "incidental" to the town house development. *Id.* Specifically, the court reasoned:

> .... The primary aspect of the proposed project is the construction of a townhouse community, not the construction of a boat storage facility and launch which are incident to it. Shoreline has failed to show, in compliance with the regulations, why it is necessary for the townhouses to be located on the wetlands rather than the uplands, except for its preference to build on the wetlands.

*Shoreline,* 555 F.Supp. at 179 (footnote omitted). As a consequence, the court further concluded that

> [i]f Shoreline firmly believed that the boat facilities were of primary importance, it could have sought a permit for this activity alone[,] which, presumably, would have required a much reduced impact on the wetlands. [Shoreline's attached appendices] ... clearly show[ ] that the vast bulk of the filling of 8.2 acres was necessitated by the housing development itself [and not the boat facilities and launch area].

*Id.* at 179 n. 40. But the facts of Shoreline are inapposite to the case at bar. The record before this Court supports MDE's conclusion that a "big box" store is a "legitimate" business proposition, *See, e.g., Sylvester,* 882 F.2d at 409,[11] and not "a pretense for excluding other alternatives or artificially constraining [MDE's] alternatives analysis." *Great Rivers*

---

11. *See also Van Antwerp,* 661 F.3d at 1153.

*Habitat Alliance v. U.S. Army Corps of Eng'r*, 437 F.Supp.2d 1019, 1027 (E.D.Mo.2006).

Indeed, MDE *had* initially demonstrated some skepticism regarding 1691's design and requested detailed information regarding alternative designs for the property and the reasons why 1691 had rejected those designs. In that regard, MDE added that "[w]hile the [CSAP] states that the west side of [Maryland Route 3] is the appropriate area for the expansion of commercial development, it does not require a 'big box' retail design." 1691 replied to MDE's request, providing a detailed alternative site and design analysis, which concluded that other designs and sites would result in more impact to the nontidal wetlands. At the contested case hearing, 1691 presented ample testimony that "big box" stores occupy a specific niche in the retail market and employ a uniform design strategy across the country. Further, 1691 noted that it had made extensive efforts to minimize the impact of the project by reducing the overall footprint of the building by twenty-five percent, reducing the paved area by fifteen percent, and reducing the fill proposed for the property's floodplain and nontidal wetlands to twenty-five percent. Therefore, the record clearly reflects that MDE did not summarily accept 1691's proposed basic purpose, but, in fact, engaged in an independent analysis to determine that the project's purpose was supported by substantial evidence. As a consequence, we can hardly say that MDE's determination of the project's basic purpose was arbitrary and capricious. *See Sylvester*, 882 F.2d at 409–10.

Nonetheless, appellants maintain their contention that MDE rendered its final decision in contravention of alleged practicably alternative designs. Specifically, appellants argue that MDE erred by failing to appropriately consider whether "alternative designs [existed] that would result in less adverse impact on the nontidal wetlands [and whether such alternative designs] would ... accomplish the basic purpose of the project[,]" *see id.* § 5–907(b)(2), arguing that the FDM based her decision solely on the cost of alternative designs without considering other important factors in the alternative design

calculus. We conclude, however, that the FDM committed no error in rendering her decision that no practicable alternative design existed.

As observed *supra*, when addressing whether a practicable alternative exists, MDE must consider "[w]hether a reduction in the size, scope, configuration, or density of the project as proposed and all alternative designs that would result in less adverse impact on the nontidal wetland[s] would not accomplish the basic purpose of the project[.]" Md.Code (1996, 2007 Repl.Vol.), § 5–907(b)(2) of the Environmental Article. Similar to the definition of "basic purpose," there is no Maryland case law on point that addresses the circumstances under which this Court may confidently observe that MDE reasonably considered and dismissed alternative designs. Therefore, because Maryland's Nontidal Wetlands Protection Act and accompanying regulations are harmonious—and in some instances mirror—the CWA and its accompanying federal regulations,[12] we turn our attention to the reasoning of the United States Circuit Courts of Appeal to determine whether MDE properly found that no practicable alternative existed for 1691's proposed project.

In 2008, the United States Court of Appeals for the Ninth Circuit considered whether the Corps adequately considered practicable alternatives to a proposed project's design in *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'r ("BSC")*, 524 F.3d 938, 947 (9th Cir.2008). There, the Alaska Gold Company ("AGC") had applied for a permit with the Corps for a major gold-mining project near Nome, Alaska, formally known as the Rock Creek Mining Project. *Id.* at 943. Ultimately, AGC's proposed project would be approved by the Corps through the issuance of a permit. *Id.* AGC's proposed project would consist of two open-pit gold mines at separate locations outside of Nome, plus facilities built for recovering gold ore. *BSC*, 524 F.3d at 943. Once the proposed project was approved and mining

---

12. *See* discussion of the similarities between Maryland's statute and the CWA and accompanying regulations *supra*.

would commence, about 15,592,411 cubic yards of fill from the mine would be placed in wetlands totally 346.5 acres. *Id.* In an effort to prevent the AGC's potentially damaging effect on Alaskan wetlands, Bering Strait Citizens for Responsible Resource Development with other concerned parties (collectively referenced as "BSC") sought a temporary restraining order and preliminary injunction before the United States District Court for the District of Alaska, alleging that the Corps had violated the CWA and National Environmental Policy Act ("NEPA")[13] by granting a permit for the Rock Creek Mine Project. *Id.* The District Court ultimately denied BSC's motion for injunctive relief and dismissal of its suit on summary judgment. *Id.*

On appeal before the Ninth Circuit, BSC argued that the Corps had failed to adequately consider practicable alternative designs and locations AGC's Rock Creek Mining Project. *BSC*, 524 F.3d at 947–48. Specifically, BSC, in part, asserted "that the Corps failed to consider the option of relocating only the North waste dump at the Rock Creek Mine/Mill site to an upland site." *Id.* at 948. "In support of [BSC's] claim, [it] cite[d] to the ... rejection of an alternative design that would [have] placed all facilities in uplands and claims that the Corps failed to consider the relocation of some, but not all, of the facilities." *Id.*

The Ninth Circuit rejected BSC's contentions and observed that although "[t]he Corps considered and rejected the 'all uplands' alternative [design] ... contrary to BSC's assertion, that was not the only alternative design considered." *Id.* Indeed, the appellate court noted that the record reflected that the "Corps consid[ered] ... 24 different design alterna-

---

13. "Unlike the [CWA], NEPA requires no substantive result. *New Mexico [ex rel. Richardson v. Bureau of Land Management]*, 565 F.3d [683], 704 [ (10th Cir.2009) ]. NEPA imposes procedural, information-gathering requirements an agency, but is silent about the course of action the agency should take. *Id.* [Therefore,] 'NEPA merely prohibits uninformed—rather than unwise—agency action.' " *Hillsdale*, 702 F.3d at 1165 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989)). *See* further discussion of *Hillsdale infra.*

tives." *Id.* Thus, the court found that " '[w]hile an argument can be made that one of these sites was suitable, it would not be appropriate for [the Court] to overturn the Corps' contrary finding.' " *BSC,* 524 F.3d at 948 (quoting *Hintz,* 800 F.2d at 834) (addition provided in *BSC* ). Therefore, the court concluded that the Corps "reasonably reviewed the feasible options and reasonably concluded that the proposed design was the best design alternative." *Id.*

Much like the Ninth Circuit in *BSC, supra,* the United States Court of Appeals for the Tenth Circuit more recently addressed similar contentions regarding the Corps consideration of alternate designs in *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'r ("Hillsdale* "), 702 F.3d 1156 (10th Cir.2012). There, several environmental groups ("Hillsdale") raised concerns regarding the construction of a Burlington Northern Santa Fe rail/truck terminal outside Kansas City, Kansas. *Id.* at 1162. Because the applicant's preferred site contained streams and wetlands protected under the federal law, the Hillsdale challenged the permitted dredging and filling permits issued by the Corps under the CWA. *Id.* On appeal before the Tenth Circuit, Hillsdale requested that the court set aside the Corps' decision to grant the permit "because the Corps inadequately considered alternatives to the selected site under the [CWA]. . . . " *Id.* Specifically, Hillsdale argued that the Corps and applicant failed to provide " 'detailed, clear and convincing' information establishing the eliminated alternatives were not practicable." *Id.* at 1168 (quoting *Utahns for Better Transp. v. U.S. Dept. of Transp.,* 305 F.3d 1152, 1186 (10th Cir.2002)).

Rejecting Hillsdale's argument that the Corps had not adequately considered alternative designs and locations by clear and convincing evidence, the appellate court noted that the practicable alternatives analysis "does not require a specific level of detail to rebut the presumption, but only record evidence the agency took a hard look at the proposals and reached a meaningful conclusion based on the evidence." *Hillsdale,* 702 F.3d at 1168 (discussing 40 C.F.R. § 230.10(a)(3)). The court additionally noted that although

the Corp's environmental assessment had not explained in detail "the application of every criterion to every site," it did, however, "provides more explanation when necessary." *Id.* In concluding that the Corps had adequately considered and ruled out alternatives, the court observed that

> [t]here is no magic number of alternatives the Corps must consider for its analysis to be acceptable, but the agency must draw the line somewhere, even when [the] presumption [for projects independent of water] applies. "There will always be more data that could be gathered; agencies must have some discretion to decide when to draw the line and move forward with decision making." *Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.,* 673 F.3d 518, 531 (7th Cir.2012) (quoting *Town of Winthrop v. FAA,* 535 F.3d 1, 11 (1st Cir.2008)).

*Hillsdale,* 702 F.3d at 1169–70. In addition, the court noted that in evaluating the practicability of alternatives, the Corps is not entitled to reject an applicant's determination that a particular type of development is economically advantageous so long as to the proposed project is legitimate. *Id.* at 1170. Therefore, the reviewing agency is "entitled to accept a project applicant's criteria based on information the applicant submits." *Id.* If the proposed alternatives do not provide for lesser impact on the wetlands than the plan provided by the applicant, the proposed alternatives are not practicable. *Id.* at 1168 ("For an alternative to be selected under the Corps'[ ] CWA regulations, it must be practicable ... and it must be less environmentally damaging than all other practicable alternatives.").

Indeed, while both the Ninth Circuit's opinion in *BSC* and the Tenth Circuit's opinion in *Hillsdale* articulate the applicable test in somewhat different ways, the analysis in each focuses on the record in front of the agency and emphasizes the deference that reviewing courts should give to the agency's determinations of the complex environmental and economic issues raised in cases such as the one before us. Like the Ninth Circuit in *BSC,* we conclude that the FDM "reasonably reviewed the feasible options and reasonably concluded that

the proposed design was the best design alternative[.]" Given the back-and-forth between MDE and 1691 in the instant case, we have no trouble discerning the path of the Department's reasoning over time and cannot conclude that its ultimate decision was unsupported by the record. To be sure, 1691 informed MDE that

> Several building layouts [had been] considered for [the] site and rejected due to access and/or safety. Other areas near the site were too steep and narrow and would have greater wetland impacts, including Little Patuxent River swamp. . . .

Further, 1691 provided a series of methods that it used to avoid and minimize impacts as a result of the regulated activities of filling and dredging:

> 1. The proposed size of the retail store footprint on the site has been reduced in order to reduce parking requirements, improve traffic flow, and reduce the total amount of impervious surface[.]
>
> 2. The configurations of the wetland and floodplain boundaries allow for more development on this site than is proposed, however, service drives and access areas have been reduced to the minimum that will allow safe and reasonable access to the building[.]
>
> 3. Retaining walls and other construction methods have been incorporated into the design of the project in order to avoid and minimize impacts to regulated areas while producing sufficient buildable area[.]
>
> 4. The [proposed development] has been swept around the upland side of the floodplain limits rather than closely following the limits, providing a buffer between the floodplain and the edge of the development in many places.
>
> 5. Design and placement of stormwater control devices will help minimize hydrological impacts on the onsite (non-swamp) wetlands.

In addition, 1691's dismissal of a two-story design further explained that "while the use of a [two-story] design would **marginally reduce the building footprint,** a significant park-

ing field would still be required under the requirements of the Anne Arundel County Code, and **given site restrictions only negligible reduction in wetlands impact would** result." (emphasis added). Thus, even if the two-story design provided a slightly smaller footprint, the reduction on impacts to wetlands and wetland buffers would be minimal to non-existent and a much higher cost. An alternative that does not reduce the size of the impact is not practicable. Further, MDE's back-and-forth exchange with 1691, the information provided by 1691 regarding potential alternatives, and the negligible to nonexistent reduction and that any further reduction in size would frustrate the project's basic purpose clearly support that substantial evidence existed to support the FDM's decision. Accordingly, we find that the FDM committed no error in concluding that no practicable alternative existed pursuant to Section 5–907(b)(2) of the Environmental Article.

### (2) The FDM's and ALJ's Findings That Public Need Existed.

■ During the contested case hearing, 1691 began its case by offering the testimony of William D. Berkshire ("Mr. Berkshire"), president of Lancer Corporation. Lancer Corporation serves as the general partner to 1691. Mr. Berkshire first attested to 1691's acquisition of the property in 1987, indicating that the purpose of the property's acquisition was to create activity on the west side of Maryland Route 3 to serve the Crofton area's public need. He further noted that shortly after 1691's acquisition of the property, 1691 mutually agreed with the Crofton Community in December of 1988 "that, in exchange for consideration of preserving a lot of open space land, that the western part of—the western side of Route 3 would be reserved as a commercial retail regional servicing center." Specifically Mr. Berkshire testified that

> ... the idea was to establish mutual agreement that, for considerations on both sides, the community would be able to rely upon assertions that open space would continue its residential section, residential portion of the community,

and that development could take place in certain agreed upon areas, basically in the western side of Route 3.

And that, in particular, this document calls for the community to actively support the agreement. And in fact, the community did. It's signed by the President of the Community Association and it required that the community formally present itself to the county in the rezoning that was going on in 1988 to support a rezoning application of the land to be zoned from various smaller commercial zones to C–3, which would enable the subject property and other property there on the western side of Anne Arundel County to join the other development that was taking place along the western side of Route 3, in a higher regional servicing retail environment.

Following his detailed explanation of the agreement that 1691 reached with the Crofton community and the subsequent rezoning of the property, Mr. Berkshire noted that 1691 then began discussing the implementation of the corporation's developmental goals with several brokers and retailers as prospective end-users to the property and additionally addressed 1691's initial application with MDE. It was during these discussions that 1691's project purpose was fully realized. Mr. Berkshire discussed the realization of the project's purpose during the following colloquy with counsel at the contested case hearing:

[Mr. Berkshire]: The project purpose is, as it was filed, is to be able to create and fulfill a need for a regional servicing retail center that can fulfill the needs of this area, which the existing commercial family does not fulfill.

[Counsel for 1691]: And [is] the regional servicing retailer center[ ] synonymous with big-box here [sic], you've indicated that ... is the projected purpose.

[Mr. Berkshire]: Yes, that has been the project purpose. Yes, and it is.

[Counsel for 1691]: And why is that the project purpose and not simply a smaller strip center, as some public comments have provided?

[Mr. Berkshire]: As I said, the area is already well serviced by other retail services. And the services that this regional facility can provide for the citizens of the area can only be done by a larger retail service installation.

[Counsel for 1691]: And the larger retail servicing institutions, have you been contacted by those end-users?

[Mr. Berkshire]: Yes. Over the years, we have been contacted by numerous, numerous end-users. Probably all of what's called the big-box retailers that exist [sic]. Not only the stated Wal–Mart, but Cabelas, Costco, B.J.'s, [and] Ikea. I could give a list, Your Honor, of probably a couple dozen of these by specific retail name, as well as a dozens of other regional servicing centers. Literally that many.

Thereafter, 1691's counsel inquired whether the "big-box retail servicing centers" had contacted and solicited 1691. Mr. Berkshire responded affirmatively. This dialogue prompted the objection of appellants' counsel on grounds of hearsay. Appellants' objection was subsequently overruled by the ALJ.

Consecutive to the ALJ's ruling, Mr. Berkshire began discussing a commercial brokerage firm's report of 2001 (the "KLNB report"), which provided information regarding the Crofton area's economic marketplace. Anticipating 1691's offering of the KLNB report into evidence, appellants objected, and the following colloquy ensued:

[Appellants' counsel]: Object. May I be heard very briefly? I apologize for the interruption.

[ALJ]: [1691] hasn't offered it yet.

[Appellant's counsel]: I know, but . . .—I'm mindful of that point, but [Mr. Berkshire] is about to discuss the document and there's a technical point as to whether the Agency could rely on a document to defend its decision when it wasn't in the administrative records. A technical point that I alluded to in my opening and I think this is the appropriate time to raise that objection.

[ALJ]: All right. I heard your point in your opening[,] but[ ] go ahead and make your point and I'll make a

decision. If you want to speak to your—tell me what your objection is.

[Appellants' counsel]: This case concerns the Agency's approval of a certain permit and the applicant now seeks to introduce, into the record, a document that the Agency did not have when it relied—when it issued its determination. And this is a challenge to an administrative decision and the technical point that I'm making, and this is where [1691's counsel] and I disagree, is that I believe that under the law, the Agency cannot supplement the record in this way to have an *ex post facto* explanation of what he [sic] did before, when it didn't have the benefit of this document. And so, I raise that objection.

MDE responded to appellants' argument and contended that "[t]he whole purpose of [the contested case hearing] is to get a full and complete record [on which] [MDE] can then render a final decision [regarding the contested] permit." The Department further noted that the contested case hearing "process is designed to generate the evidence [on which] the Department will base its final decision. . . . And the testimony [of Mr. Berkshire] and the[ KLNB report is] relevant— relevant to that analysis." After 1691 echoed MDE's argument, the ALJ admitted the KLNB report over appellants' objection. Thereafter, Mr. Berkshire attested that the KLNB report provides

a description of the demographics of the area, describing the economic and other factors that exist. It describes the, in my reading of it, the area. It paints a picture of the marketplace that exists here and the need that has to be fulfilled. It can be fulfilled by the facility that is proposed here, that is why it is part of our purpose here. And[,] in my opinion, . . . it fulfills what we had hoped to fulfill in the original agreement with the community in 1988.

In addition, Mr. Berkshire indicated that the acreage zoned C–3 had increased consequently with the growth in Crofton's population as a result of the "influx" of military families pursuant to the Defense Base Realignment and Closure Act of

1990 ("BRAC"), Pub.L. No. 101–510, 104 Stat. 1485 (codified as amended at 10 U.S.C. § 2687 (2011)). Mr. Berkshire opined that "tens of thousands of people and jobs [would] com[e] ... within [the] marketplace in the Crofton area and Fort Meade," as a result of BRAC, providing "extreme further evidence of need."

Thereafter, Mr. Berkshire discussed in greater detail the zoning of the area in which 1691 planned to place its proposed project, indicating that the zoning was consistent with both the initial agreement of 1988 and the CSAP of 2001. Mr. Berkshire described the CSAP in the following dialogue with 1691's counsel:

[Counsel for 1691]: Can you describe the small area plan process as it relates to this parcel on your property?

[Mr. Berkshire]: Yes. In about 2001, the county decided that it was going to comprehensively re[-]zone itself again, as in '88, and divided the county up into[,] I think[,] eight or nine areas called small area plans. And each area was given a committee, of which I served on Crofton's, at the time to solicit statements and opinions from experts and citizens as to what facilities and combinations for services would beneficial to the area. And the Crofton area is the Crofton Small Area Plan.

[Counsel for 1691]: So you actually sat on the Crofton Small Area Planning Committee?

[Mr. Berkshire]: Yes, I did.

\* \* \*

[Counsel for 1691]: And were there any particular discussions regarding this parcel in the Small area Plan?

[Mr. Berkshire]: Yes. The agreement with the community was discussed, along with many, many other things. And the subject matter of the community was one that the Small Area Plan, I think, adopted and wished to see go forward.

And, in fact, during this process there was a small portion of this property increased in zoning at the request of the Small Area Plan and agreed to by the county.

[Counsel for 1691]: And this was all still part of fulfilling the overall land plan for the area?

[Mr. Berkshire]: Yes. This was part of trying to fulfill the planning of both the community—the desires of the community and the planning of the county in the 1988 General Redevelopment Plan that was adopted in 1988.

Thereafter, the CSAP was admitted into evidence without any objection. Both the ALJ and FDM subsequently relied, in part, on the testimony provided by Mr. Berkshire, on the KLNB report, and the CSAP in their findings of public need.

Notwithstanding the ALJ and FDM's finding of public need, appellants contend before this Court that the record lacked substantial evidence supporting the FDM's and ALJ's decisions that a public need existed for the development for three reasons. First, appellants contend that the ALJ erred by admitting hearsay evidence regarding the KLNB sales brochure, the interest by national "big box" retailers provided through Mr. Berkshire's testimony, and BRAC's impact on the Crofton area additionally provided in Mr. Berkshire's opinion before the ALJ. Second, appellants argue that planning and zoning documents included in the CSAP are irrelevant to the existence of public need, and, therefore, should have been excluded from the evidence. Third, appellants insist that the advancement of the CSAP's goals in creating a passive parkland is irrelevant to public need, and, therefore, should have been excluded from evidence. In sum, the thrust of appellants' first assignment of error is that had the FDM and ALJ excluded of the above-mentioned materials from their consideration regarding the existence of public need, the record would have lacked substantial evidence.

■ We conclude, however, that appellants are foreclosed from presenting arguments on the basis of the KLNB record and the CSAP and premised on Mr. Berkshire's opinion regarding the impact of the BRAC. During appellants' contemporaneous objection to the admission of the KLNB report, appellant failed to present argument that the KLNB report was inadmissible hearsay. Because appellants raised specific

contentions regarding the report's inadmissibility, which did not include their bald assertion that the KLNB report was "too old" to be reliable, appellants are precluded from raising the issue for the first time on appeal. *Cf. Rosov*, 163 Md.App. at 112, 877 A.2d 1111. "Ordinarily, [this Court] will not decide any other issue unless it plainly appears by the record to have been raised in or decided" below. Md. Rule 8–131(a). Therefore, when specific grounds for an objection are stated, any other argument not presented by a party to the adjudicating body are deemed waived. *See Klauenberg v. State*, 355 Md. 528, 541, 735 A.2d 1061 (1999) (noting that when specific grounds for the objection are stated, the party has deemed to have waived all other grounds on appeal).

To be sure, appellants *did* raise *an* argument before the ALJ during the contested case hearing, regarding the admissibility of the KLNB record. Nonetheless, appellants' objection regarding the KLNB record's admissibility was not on the basis of hearsay. Rather, the argument presented to the ALJ pertained to "a technical point as to whether [1691 and MDE] could rely on a document to defend its decision when it wasn't in the administrative records." Indeed, appellants' counsel presented the following argument before the ALJ:

This case concerns the Agency's approval of a certain permit and the applicant now seeks to introduce, into the record, a document that the Agency did not have when it relied—when it issued its determination. And this is a challenge to an administrative decision and the technical point that I'm making, and this is where [1691's counsel] and I disagree, is that **I believe that under the law, the Agency cannot supplement the record in this way to have an *ex post facto* explanation of what he [sic] did before, when it didn't have the benefit of this document. And so, I raise that objection.**

(emphasis added). Further, appellants presented no objections to the admission of the CSAP and Mr. Berkshire's opinion regarding the impact the BRAC, an act and public law

passed by the United States Congress, at the time Mr. Berkshire offered his opinion.[14] If a party fails to offer any objection, "[it] will not later be heard to complain that the evidence should not have been admitted." *Ginn v. Farley,* 43 Md.App. 229, 236–37, 403 A.2d 858 (1979) (quoting *Baltimore & Ohio R.R. v. Black,* 107 Md. 642, 658 (1908)).

Since appellants raised a specific objection to the admission of the KLNB report, which did not include the issue of hearsay, and raised no objections to the admission of the CSAP and Mr. Berkshire's opinion regarding the impact of the BRAC, appellants' contentions regarding the admissibility of these materials are unpreserved for this Court's review. Nonetheless, even if appellants had not abandoned these arguments, appellants' assertions would remain without merit.

We shall, therefore, (1) address appellants' argument regarding the admissibility of Mr. Berkshire's statements regarding whether the "big-box retail servicing centers" had contacted and solicited 1691 and the admissibility of the KLNB report,[15] (2) aggregate appellants' claims of relevancy and address them in tandem, and (3) conclude that the FDM

---

14. We note that even if appellants had raised an objection to the admission of Mr. Berkshire's statements regarding the BRAC's impact on the Crofton area's public need for the proposed project on the basis of inadmissible hearsay, our consideration would not change the ultimate outcome. Mr. Berkshire's statements regarding the BRAC do not constitute hearsay. As discussed *infra,* "hearsay" is a statement, other than one made by the declarant while testifying at trial or at a hearing, offered into evidence to prove the matter asserted. Md. Rule 5–801.

Mr. Berkshire's statements neither alleged what the contents of the law actually stated nor provided any information other than his personal, lay opinion regarding the impact of the law on the Crofton area. Mr. Berkshire's statements were rationally based on his own perceptions and helpful in providing a clear understanding of his other testimony and to a fact in issue. *See* Md. Rule 5–701. *Contra* Md.Code (1984, 2009 Repl.Vol. & 2012 Supp.), § 10–213(d) of the State Government Article. *See* Part IV(A)(1), *infra.*

15. While not required, as appellant failed to preserve the issue relating to the admissibility of the KLNB report, we shall proceed with our own independent analysis in the interest of ensuring that appellants' due process rights remain untrammelled. *See, e.g., Travers v. Baltimore Police Dep't,* 115 Md.App. 395, 413, 693 A.2d 378 (1997).

committed no error in her consideration of the above-mentioned, evidentiary materials.

### (a) The Admissibility and Consideration of Hearsay Evidence.

"Hearsay" is a statement, other than one made by the declarant while testifying at trial or at a hearing, offered into evidence to prove the matter asserted. Md. Rule 5–801. In general, hearsay is inadmissible unless otherwise provided by the rules of evidence or permitted by applicable constitutional provision or statute. Md. Rule 5–802. *See, e.g.,* Md.Code (1984, 2009 Repl.Vol., 2012 Cum.Supp.), § 10–213(c) of the State Government Article. Nonetheless, within the context of administrative proceedings, it is well-settled that administrative agencies are not bound by "technical common law rules of evidence." *Dickinson–Tidewater v. Supervisor,* 273 Md. 245, 253, 329 A.2d 18 (1974), *quoted in Tron v. Prince George's Cnty.,* 69 Md.App. 256, 261, 517 A.2d 113 (1986) (noting that "[i]n most applications[,] this means that hearsay evidence is acceptable in an administrative hearing[.]"). *See Richardson v. Perales,* 402 U.S. 389, 401–402, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). *Accord Travers v. Baltimore Police Dep't,* 115 Md.App. 395, 408, 693 A.2d 378 (1997) (observing that "the rules of evidence are generally relaxed in administrative proceedings.") (citation omitted).

"These principles are embodied in the statutory language comprising the APA[.]" *Travers,* 115 Md.App. at 408, 693 A.2d 378. Specifically, Section 10–213 of the State Government Article provides the guidelines by which evidence is admitted during a contested case hearing. It states, in relevant part:

(a) *In general.*—(1) each party in a contested case shall offer all of the evidence that the party wishes to have made part of the record.

(2) If the agency has any evidence that the agency wishes to use in adjudicating the contested case, the agency shall make the evidence part of the record.

(b) *Probative evidence.*—The presiding officer may admit probative evidence that reasonable and prudent individuals commonly accept in the conduct of their affairs and give probative effect to that evidence.

**(c) *Hearsay.*—Evidence may not be excluded solely on the basis that it is hearsay.**

(d) *Exclusions.*—The presiding officer **may** exclude evidence that is:

 (1) incompetent;

 (2) irrelevant;

 (3) immaterial; or

 (4) unduly repetitious

* * *

(f) *Scope of evidence.*—On a genuine issue in a contested case, each party is entitled to:

 (1) call witnesses;

 (2) offer evidence, including rebuttal evidence;

 (3) cross-examine any witness that another party of the agency calls; and

 (4) present summation and argument

(g) *Documentary evidence.*—The presiding officer **may** receive documentary evidence:

 (1) in the form of copies of excerpts; or

 (2) by incorporation by reference.

Md.Code (1984, 2009 Repl.Vol. & 2012 Supp.), § 10–213 of the State Government Article (emphasis added).

"In drafting the aforementioned provisions of the APA . . . , the General Assembly implicitly recognized that the formal rules of evidence possess far greater utility in jury trials than an agency hearing before a presumably expert hearing office." *Travers,* 115 Md.App. at 408, 693 A.2d 378 (relying on Richard J. Pierce, *Use of the Federal Rules of Evidence in Federal Agency Adjudications,* 39 ADMIN. L.REV. 1, 17–19 (1987)) (additional authority omitted). Indeed, Section 10–213 of the State Government Article suggests an "emphasis upon the

informal rather than the formal. This, we think, is as it should be, for this administrative procedure, and these hearings, should be understandable to the layman claimant, should not necessarily be stiff and comfortable only for the trained attorney, and should be liberal and not strict in tone and operation." *Perales,* 402 U.S. at 400–401, 91 S.Ct. 1420.

██ "It follows, therefore, that hearsay evidence that is [generally] inadmissible in a judicial proceeding **is not necessarily inadmissible in an administrative proceeding[,]**" *Travers,* 115 Md.App. at 408, 693 A.2d 378 (citing *Maryland Dep't of Human Resources v. Bo Peep Day Nursery,* 317 Md. 573, 595, 565 A.2d 1015 (1989)) (emphasis added), so long as the hearsay's admission into evidence observes the basic rules of fundamental fairness. *Perales,* 402 U.S. at 401, 91 S.Ct. 1420; *Rosov v. Maryland State Bd. of Dental Examiners,* 163 Md.App. 98, 114, 877 A.2d 1111 (2005); *Travers,* 115 Md.App. at 411, 693 A.2d 378; *Dep't of Pub. Safety & Corr. Serv. v. Scruggs,* 79 Md.App. 312, 321–22, 556 A.2d 736 (1989). *See also* Arnold Rochvarg, Principles and Practice of Md. Administrative Law 75 (Carolina Academic Press, 2011) (citing *Cecil Cnty. Dep't of Soc. Serv. v. Russell,* 159 Md.App. 594, 612, 861 A.2d 92 (2004)).

██ As a consequence, "[t]he critical requirement to be gleaned . . . is that, whether judicial or administrative proceedings, the evidence presented must be considered '*competent.*'" *Scruggs,* 79 Md.App. at 322, 556 A.2d 736 (emphasis in original). We are mindful, however, that **"it is not the hearsay nature of proffered evidence that is determinative of whether such evidence is admissible."** *Travers,* 115 Md.App. at 413, 693 A.2d 378 (emphasis added). Rather, "as our analysis of the Court of Appeals'[ ] jurisprudence on this issue indicates," there are three considerations to the hearsay competency calculus: "the evidence's probative value, reliability, and fairness of its utilization[.]" *Id.* This calculus is applied in a two-step process. First, one must consider the hearsay's reliability and probative value. Once the offered hearsay is deemed sufficiently reliable and probative, one

must then consider whether the hearsay's admission contravenes due process. *See Perales*, 402 U.S. at 402, 91 S.Ct. 1420. *Accord Travers*, 115 Md.App. at 416, 693 A.2d 378. Therefore, "[h]earsay evidence **is** admissible before an administrative forum in contested cases and, if such evidence is credible and sufficiently probative, '**it may be the sole basis for the decision of the administrative body**[,]' " *Rosov*, 163 Md.App. at 113, 115, 877 A.2d 1111 (quoting, in part, *Fairchild Hiller Corp. v. Supervisor of Assessments for Washington Cnty.*, 267 Md. 519, 523, 298 A.2d 148 (1973)) (some internal quotation and citation omitted) (emphasis added), as long as the relaxed rules are not misapplied in an arbitrary or oppressive manner, depriving the party of his or her right to a fair hearing. *Travers*, 115 Md.App. at 412, 693 A.2d 378 (relying on *Comm'n on Med. Discipline v. Stillman*, 291 Md. 390, 422, 435 A.2d 747 (1981)).

■■ In the instant case, appellants contention that Mr. Berkshire's testimony offered during the contested case hearing regarding whether potential end-users had contacted and solicited 1691 constitutes inadmissible hearsay is plainly wrong. As noted, *supra*, "hearsay" is a *statement*, other than one made by the declarant while testifying at trial or at a hearing, offered into evidence to prove the matter asserted. Md. Rule 5–801. Mr. Berkshire's testimony regarding the solicitous *conduct* of big-box retail servicing centers contained no communicative statements of the potential end-users. Rather, his testimony was based on his personal knowledge and perception of the potential end-users' conduct. In addition, his statements regarding efforts to find a property that met the requisite public need do not include specifics about what any potential end-user had requested. Mr. Berkshire simply stated that the end-users' needs prompted him to investigate particular parcels of land within the Crofton area marketplace. Therefore, the ALJ and FDM committed no error in considering Mr. Berkshire's testimony.

Moreover, appellants failed to articulate how the KLNB report is incompetent or unreliable except for the bald assertion that it was "too old to be substantial evidence." Nor have

appellants demonstrated how either the ALJ's or FDM's decisions to consider the report was arbitrary or oppressive. In fact, appellants' specific objection to the admission of the KLNB report precluded any consideration of the two-step hearsay analysis, because they failed to present the issue before the ALJ and FDM. Notwithstanding appellants' failure, however, the past treatment of similar reports support sufficient reliability and probative value. The identity of the report's authors were known, and Maryland Rule 5–803, entitled, "Hearsay exceptions: Unavailability of declarant not required," provides two exceptions to the rule against hearsay which may have been applicable to the report's proper admission had this matter been tried before the trial court. *See* Md. Rules 5–803(b)(6) & (17).[16] Indeed, the record from the contested case hearing contained testimony that it would be appropriate for a planner to rely on the type of data found within the KLNB report. Further, Mr. Berkshire attested that the KLNB report was created to assist 1691's understanding of the Crofton area's demographic marketplace.

Nonetheless, appellants contend that they were precluded from cross-examining the authors of the KLNB

---

**16.** Md. Rule 5–803(b), in relevant part, provides:

(6) Records of regularly conducted business activity. A memorandum, report, record, or data compilation of acts, events, conditions, opinions, or diagnoses if (A) it was made at or near the time of the act, event, or condition, or the rendition of the diagnosis, (B) it was made by a person with knowledge or from information transmitted by a person with knowledge, (C) it was made and kept in the course of a regularly conduct business activity, and (D) the regular practice of that business was to make and keep the memorandum, report, record, or data compilation. A record of this kind may be excluded if the source of information or the method or circumstances of the preparation of the record indicate that the information in the record lacks trustworthiness. In this paragraph, "business" includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

\* \* \*

(17) Market reports and published compilations. Market quotations, tabulations, lists, directories, and other published compilations, generally used and reasonable relied upon by the public or by persons in particular occupations.

report, thereby violating their due process rights. Although we recognize "the basic tenet of fairness in administrative adjudications is the requirement of an opportunity for reasonable cross-examination," *Travers*, 115 Md.App. at 416–17, 693 A.2d 378, fairness also requires the complaining party to avail itself of the opportunity to cross-examine. *Id.* at 418, 693 A.2d 378 (relying on *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). *Accord Rosov*, 163 Md.App. at 117, 877 A.2d 1111. As a consequence, the complaining party must subpoena testimony or a witness of the production of any evidence when the administrative proceeding permits. *Travers*, 115 Md.App. at 418, 693 A.2d 378.

Our decision in *Travers v. Baltimore Police Dep't*, 115 Md.App. 395, 693 A.2d 378 (1997), is instructive. Travers, a former Baltimore City police officer, was accused of violating departmental rules and regulations. *Id.* at 400, 693 A.2d 378. He alleged that the administrative trial board erred in admitting hearsay statements of the alleged victim through the testimony of other officers, depriving him of the opportunity to cross-examine the alleged victim. *Id.* at 407–08, 693 A.2d 378. Travers had not subpoenaed the alleged victim. Writing for this Court, Judge Glenn T. Harrell, Jr., (now, of the Court of Appeals) opined that

> ... **because appellant failed to exercise his right to subpoena [the victim],** see Md. Ann.Code, art. 27 § 730(j), **we conclude that he has effectively waived his right to complain about a denial of the opportunity to cross-examine [her].** In 1971, the Supreme Court in *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), upheld the admission of hearsay evidence in a proceeding before the Social Security Board, noting that Perales' lawyer could have subpoenaed the hearsay declarant but did not do so. *Id.* at 404–05 [91 S.Ct. 1420]. Although not citing *Perales*, we held in *American Radio–Telephone [Service, Inc. v. Public Service Com.*, 33 Md.App. 423, 365 A.2d 314 (1976) ] that the error in admitting affidavits, without subjecting the affiant to cross-examination, was harmless because the opponents "made no request for ...

an opportunity to bring the affiant in for cross-examination." 33 Md.App. at 435, 365 A.2d [at] 320. Finally, in *Tron*, we distinguished Perales on the ground that *Tron* [*v. Prince George's Cnty.*, 69 Md.App. 256, 517 A.2d 113 (1986) ] had not been furnished with subpoena power, while the claimant in *Perales* failed to exercise his right under the Social Security Act to subpoena adverse witnesses. **We read *Perales* as standing for the proposition that claimants who forgo their right to subpoena known, material witnesses effectively waive any objections to denial of an opportunity to cross-examine.** 69 Md.App. at 264, 517 A.2d at 117. *Accord Changing Point, Inc. v. Maryland Health Resources Planning Comm'n,* 87 Md.App. 150, 172, 589 A.2d 502 (1991); *but cf. Kade* [*v. Charles H. Hickey School* ], 80 Md.App. [721] at 726, 566 A.2d [148] at 151 [ (1989) ] (concluding that hearsay was reliable based on the fact that hearsay proponent did not subpoena declarant). **We conclude that, in light of appellant's failure to subpoena [the victim], the admission of her statements to Officer Moore and Lieutenant Henderson did not vitiate appellant's right to a fair administrative hearing.**

*Id.* at 418–19, 693 A.2d 378 (emphasis added).

The regulations governing MDE's contested case hearings explicitly provide all parties subpoena power. Specifically, COMAR 26.01.02.18, entitled, "Subpoenas," in relevant part, provides:

B. Issuance of Subpoenas. The Office of Hearings may, on request of any party or upon the hearing examiner's own motion, issue subpoenas requiring the attendance and testimony of witnesses and the production of any evidence, including relevant books, records, correspondence, or documents in the possession or under the control of the witness, at the hearing. Requests for subpoenas may be made ex parte. A subpoena shall show on its face the name and telephone number of the party at whose request it was issued.

COMAR 26.01.02.18(B) (2012). Thus, appellants were not deprived of the opportunity to cross-examine witnesses by MDE, by 1691, by the ALJ, or by the FDM; but by their own failure to subpoena witnesses or further documentation. As a consequence, we perceive no error regarding the admission of the KLNB report or its consideration by the ALJ and FDM in determining the public need for 1691's proposed project.

(b) **The Relevancy of the Planning and Zoning Documents Within the CSAP & the Relevancy of the CSAP's Goals in Creating Passive Parkland.**

Even if appellants had objected to the admission of the CSAP, appellants' insistence that the CSAP is irrelevant to the Crofton area's public need is without merit. The CSAP is clearly relevant to a public need determination.[17]

It is well established that " '[r]elevant evidence' means evidence having **any tendency** to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5–401 (emphasis added). Alternatively, evidence that is not relevant is inadmissible. Md. Rule 5–401. The undergirdings of relevancy are comprised of two components: materiality and probative value. *Smith v. State,* 423 Md. 573, 590, 32 A.3d 59 (2011) (citing 1 McCormick on Evidence § 185, at 773 (4th Strong ed. 1992) (McCormick)). Writing more recently for the Court of Appeals in *Smith v. State,* Judge Lawrence F. Rodowsky further defined the two components of relevancy as follows:

---

17. As an initial matter, we note that evidentiary rulings, particularly those hinging on relevance, are entrusted to the sound discretion of the ALJ. *See Rosov, supra,* 163 Md.App. at 119, 877 A.2d 1111 (quoting *Parker v. State,* 156 Md.App. 252, 268, 846 A.2d 485 (2004), quoting *Jeffries v. State,* 113 Md.App. 322, 339, 688 A.2d 16 (1997)). *See also Solomon v. State Bd. of Physician Quality Assurance,* 155 Md.App. 687, 705, 845 A.2d 47 (2003). Thus, an appellate court will not second-guess a decision as to the relevancy of evidence absent a clear abuse of discretion. *Solomon,* 155 Md.App. at 705, 845 A.2d 47; *Rosov,* 163 Md.App. at 119, 877 A.2d 1111.

A material proposition is also called a " 'consequential fact' " 1 Weinstein's Evidence ¶ 401[03], at 401–10 (1980). "Materiality looks to the relation between the proposition for which the evidence is offered and the issues in the case." McCormick, § 185, at 773. Probative value is "the tendency of evidence to establish the proposition that it is offered to prove." McCormick, § 185, at 774.

423 Md. at 590, 32 A.3d 59.

Notwithstanding appellants' general assertions that the planning and zoning documents and the goals in creating passive parkland contained within the CSAP are irrelevant to a determination of public need, appellants falls short in presenting any argument that the CSAP fails to provide "any tendency" to make the proposition of public need's existence "more probable." A demonstrated public need is broader than market demand minus retail supply. To be sure, COMAR 26.23.02.04D(2)(d)(i) specifically provides that the MDE **"shall consider any pertinent information,** including the economic value that the proposed project contributes to an identified State or local economic priority and if the proposed project promotes the public health, safety, or welfare." (emphasis added). Thus, consideration of the CSAP, including its zoning documents and the stated goals in creating passive parkland, makes it more probable, in conjunction with the opinions of Mr. Berkshire and appellee's other witnesses, that public need exists, further supporting the issuance of a nontidal wetland permit. It essential to observe that

> [u]nder our system ... a party offers his [or her] evidence not *en masse,* but item by item. **An item of evidence, being but a single link in the chain of proof, need not prove conclusively the proposition for which it is offered.** It need not ever make that proposition appear more probable than not. Whether the entire body of one party's evidence is sufficient ... is one question. Whether a particular item of evidence is relevant to his [or her] case is quite another. **It is enough if the item could reasonable show that a fact is slightly more probable than it would appear without that evidence. Even after the**

**probative force of the evidence is spent, the proposition for which it is offered still can seem quite improbable.** Thus, the common objection that the inference for which the fact is offered 'does not necessarily follow' is untenable, it poses a standard of conclusiveness that very few single items of circumstantial evidence ever could meet. **A brick is not a wall.**

*McCormick, supra,* § 185, at 776 (footnotes omitted) (emphasis added), *quoted with approval in Smith,* 423 Md. at 590–91, 32 A.3d 59. *See Rosov, supra,* 163 Md.App. at 119, 877 A.2d 1111. *Cf. Parker,* 156 Md.App. at 268, 846 A.2d 485 (citing *Dorsey v. State,* 276 Md. 638, 643, 350 A.2d 665 (1976)). Therefore, both Crofton's and Anne Arundel County's long-term decisions for the proposed project's site, as explained in the CSAP and 1988 agreement, are ostensibly relevant to a determination of public need.

Because the CSAP, KLNB report, and Mr. Berkshire's statements regarding the BRAC as well as whether the "big-box retail servicing centers" had contacted and solicited 1691 were admissible within this contested case hearing and because the FDM is required, by regulation, to consider all pertinent information related to public need, COMAR 26.23.02.04D(2)(d)(i), we reject appellants' first assignment of error. As noted, *supra,* the substantial evidence test is applicable to the assessment of the agency's fact-finding and mixed questions of law and fact. It is not—as appellants assert—an after-the-fact determination of the admissibility of specific documents or the weight to be given lines of testimony provided during the contested case hearing. We accordingly conclude that neither the ALJ nor the FDM committed any error in considering the offered evidence and further hold that substantial evidence existed to support MDE's finding of demonstrated public need.

### (B) 1691's Mitigation Plan With MDE.

Our best guess at the thrust of appellants' final assignment of error that the FDM "erred legally" in approving 1691's mitigation plan because 1691 is attempting to sacrifice one

body of water of the State for another by converting the drained point into wetlands. Thus, appellants assert that this claimed practice is in contravention to Section 5–902's of the Environmental Article's stated goals of the Maryland Nontidal Wetland Protection Act, which are to attain no net overall loss in nontidal wetland acreage. In response, appellees counter that it did not matter if the applicant to a permit transferred the land to the County as part of a land exchange instead of donating the land.

It is well-settled that an administrative agency is entitled to deference in the interpretation of its own propounded regulations unless the agency's interpretation is clearly erroneous or inconsistent with the regulation. *See Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). *See also Kentuckians for the Commonwealth v. Rivenburgh,* 317 F.3d 425, 439 (4th Cir.2003) (noting that, when reviewing an agency's interpretation of its own regulation, "[t]he reviewing court does not have much leeway"); *Najafi v. Motor Vehicle Admin.,* 418 Md. 164, 173–74, 12 A.3d 1255 (2011) (quoting *Md. Aviation Admin. v. Noland,* 386 Md. 556, 571–72, 873 A.2d 1145 (2005)) (noting that "an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts. Furthermore, the expertise of the agency in its own field should be respected.").

Neither the Maryland Nontidal Wetland Protection Act, its supporting statutory provisions, or its accompanying regulations with COMAR prohibit MDE from allowing preservation by way of exchange as a component of a mitigation plan. Indeed, preservation is a subset of enhancement. *See* COMAR 26.23.04.03.F(6) (observing that "[e]nhancement activities may be accepted to replace the loss of nontidal wetland functions when an enhancement activity provides additional protection, creates, or improves the function of, nontidal wetlands[,]" including the "[p]urchase or preservation of existing nontidal wetlands"). In addition, expert testimony suggests that preserving wetlands and the uplands around them pre-

vents access to the wetlands for future development and is a means "to keep the high quality wetlands in a high quality state." Further, as in the case at bar, where the land was transferred to the county, "a public agency capable of protecting the area in perpetuity," COMAR 26.23.04.03.K(1)(c), the Department need not require an additional protection mechanism of the applicant. Moreover, should concerns eventually emerge to question any aspect of the proposed mitigation plan, MDE can require additional mitigation during the Phase II planning process. *See* COMAR 26.23.04.05.C. Accordingly, because the interpretation of the agency's regulations are fairly debatable, we conclude that the FDM committed no error in approving the mitigation plan.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY IS AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**